ALBANY,
August. 1817.

HALLETT *against* NOVION.

HALLETT
*v.*
NOVION.

THIS was an action of *trover* for a brig and cargo. The cause was tried before Mr. J. PLATT, at the *New-York* sittings, in *June*, 1816.

The plaintiff being the owner of a brig called the *Jane*, sent her with a cargo, consisting principally of flour, to *Laguira*, where she arrived in *May*, 1812, consigned to one *Shotwell*, who sold the cargo on account of the plaintiff. About the 1st of *October*, ensuing, *Smart*, the master of the *Jane*, left her, and *Charles Rise*, who had previously been the first mate, took the command. On account of the war which had at this time broken out between *Great Britain* and the *United States*, Shotwell determined to put the brig under *Spanish* colours, and, accordingly, she was placed under the name of one *Domingo Hernandez*, a *Spanish* merchant, resident in *Laguira*, and her name was changed to *Teneriffe*, under which name and apparent ownership, she proceeded, in the month of *January* following, to *Porto Cavello*. On the voyage thither, the brig was detained for a short time, by the *Rosamond*, an *American* privateer, and was the next day taken by a *British* sloop of war, called the *Fawn*, the captain of which, on being informed whither the brig was bound, directed the midshipman to take her into *Porto Cavello*, where she was liberated by the agency of *Don Jose Maria del Castillo*, a *Spanish* merchant of that place, to whom she was consigned, by paying the captors 500 dollars, which was furnished him for that purpose by *Shotwell*, as the agent of the plaintiff. *Shotwell*, who soon after arrived in *Porto Cavello*, purchased and loaded on board of the brig, on account of the plaintiff, and with his funds, a cargo consisting of hides, horns, fustic and indigo. To protect the vessel and cargo from *British* capture, they were covered by *Castillo*, in whose name the cargo was shipped, and the papers made out. The name of the brig was changed to *La Hija*, and a *Spanish* master and crew were shipped, but *Rise* continued on board and acted as the real

Where a vessel was fitted out, and a commission put on board of her, in the *United States*, for the purpose of cruising against *Spain*, with which the *United States* were at peace, which vessel, whilst so cruising, captured an *American* vessel, then sailing under *Spanish* colours, in order to avoid capture by the *British*, with whom the *United States* were then at war, and took possession of, and detained her, it was held, that this was not a question merely of prize or not, and therefore of admiralty jurisdiction, but that an action of trover would lie at common law, as the capture was illegal by the municipal law, the capturing vessel being fitted out in contravention of the act of Congress of the 5th *June*, 1794, and her commission consequently void.

Courts of common law have jurisdiction of marine trespasses, where it is not a question of prize, and it is not the place, but the nature of the case which determines the jurisdiction.

In such cases, it is matter of defence that the court of common law has not jurisdiction, and if that defence involve in it a violation of law, it will not take away the jurisdiction.

A statute giving a penalty also implies a prohibition of the act rendered penal, and such act is consequently void.

In an action of trover for the capture and detention of a cargo, bound to *New-York*, on the high seas, it was held that the proper rule of damages was the value of the cargo at the time and place of capture, allowing for the same the *New-York* prices, with such additional damages as would be equal to the interest thereon, deducting a reasonable premium of insurance from the place of capture to *New-York*; such part of the cargo, or of the avails thereof, as had been restored, going in mitigation of damages.

master. · On or about the 2d of *April*, 1813, she set out on her voyage for *New York*, consigned by *Castillo*, by the directions of *Shotwell*, to the plaintiff, and was taken again by the *Fawn* and carried to *Curracoa*, but was released in a very short time. When the *English* were on board, or near, *Rise* did not act as captain, but on all other occasions he acted in that capacity, though it is stated by one witness, that when she was detained by the *Rosamond*, *Rise* declared himself to be a passenger. The brig then proceeded on her voyage, and was, on the 20th of *April*, captured by the privateer the *San Francisco de Paula*. This vessel was originally named the *Whiting*, and had been captured from the *English* by a *French* privateer, and had become the property of the defendant; and evidence was produced on the part of the plaintiff to show, that she was the defendant's property during the voyage in which the *Jane*, or *La Hija* was captured. *Thomas H. Blount*, collector of the district and port of *Washington*, in *North Carolina*, in his deposition taken under a commission, stated, that some time in the year 1813, or latter end of 1812, a schooner, called the *Whiting*, arrrived at *Washington* from *Newbern*, having no papers except her clearance, and in *March* or *April* the defendant came to the witness's office to clear her out : that she was cleared out for *Carthagena*, and that the defendant, with one *Lewis Leroy*, gave a bond for the tonnage duty, if any should be due, as the witness at the time of her clearance was uncertain whether she was liable or not, but was afterwards induced to believe that she was not. The impression on the witness's mind, from various circumstances was, that the defendant was owner, and he had never doubted the fact. *Newman*, a ship carpenter in *Washington*, *North Carolina*, stated in his deposition, taken under a commission, that he was employed by the defendant to repair the *Whiting*, but agreed to accept one *Leroy*, a merchant in *Washington*, as paymaster. This witness was also impressed with the idea that the defendant was owner, and stated that he generally directed as to the repairs, and appeared to act as owner, but that the materials were generally obtained from *Leroy*. The strongest testimony, on this point, was that of *Lamotte*, which will be referred to in the sequel. On the part of the defendant, *Leroy* stated, in his deposition, that he (the witness) cleared out the *Whiting*, that the defendant had told him that he had sold the *Whiting* to some *Spaniards*, and the deponent understood

that the defendant acted only as agent for the owners.   Another witness, *Guygot*, in his deposition, proved the handwriting of the subscribing witness to an agreement between the defendant and *Don Juan Pedro Laborda*, dated the 2d of *February*, 1813, by which the former sold the schooner *Whiting* to the latter for the sum of 4000 dollars.   The depositions of both *Leroy* and *Guygot*, were, at the time of taking them, objected to on the part of the plaintiff.   Another witness, whose deposition was read by the plaintiff, testified that the defendant gave directions as to fitting out the schooner, while at *Washington*.   *Laborda*, who was examined as a witness by the defendant, proved his signature to the agreement before mentioned between him and the defendant: he stated that he had previously agreed with the defendant to purchase a schooner of him, but by no particular name ; nor did he, at that time, know the name of the *Whiting*, and bought her without seeing her.   The witness then went to *Carthagena* to obtain money to pay for the vessel, and while there, took a commission for her, for which he gave security in the sum of 8000 dollars : on his return from *Carthagena* he gave the commission to one Captain *Auris*, and requested the defendant to attend to fitting her out.

The *Whiting* left *Washington* in the beginning of *April*, 1813, and while inside of *Ocracock* bar, a commission was produced and read, and the schooner was then called the *San Francisco de Paula*, and shipping articles were read to the crew in which the vessel was called by that name.   It was stated in the deposition of *John Harris*, a mariner, on board of the schooner, that the *Carthagena* colours were then hoisted ; that the crew signed articles for the cruise ; and that when the articles were read, the captain told the crew that the commission had been purchased of two gentlemen from *Carthagena*, who were then on board as passengers, to which those gentlemen assented.   In order further to prove the existence of a commission, the defendant offered to read the deposition of *Pedro Gual*, with a copy of a paper in the *Spanish* language, purporting to be a commission, thereto annexed ; the plaintiff's counsel objected to the reading of this copy, because it was not duly proved, so that it could be received in evidence as proof of the original, nor was there any proof of the genuineness of such pretended original, and because, moreover, the state of *Carthagena*, by which the same purported to have been issued, was not at the time an independent state, having never been recognised by the government of

the *United States,* or other sovereign powers, as such; but the judge admitted the same to be given in evidence, subject to these objections. *Gual,* in his deposition, stated, that he was a lawyer by profession, and well informed as to the mode of transacting business in *Carthagena;* that the document thereto annexed was authentic; that he was well acquainted with the handwriting of those persons whose names were thereto subscribed, and believed them, with the stamp affixed, to be genuine. The commission, or letters of marque, purported to be granted to *Don Juan Pedro Laborda,* authorizing him, with his schooner, called *San Francisco de Paula,* commanded by *Don Lewis Auris,* to cruise against the vessels and property of the *Spanish* nation, and her dependencies, and directing him to carry into the ports of entry and delivery, within the state of *Carthagena,* the prizes that he should make, and that he should not dispose of them till the lawfulness of the prize be declared in due form. It also appeared that a *Spanish* vessel, which was taken by the *San Francisco de Paula,* on this cruise, was sent into *Carthagena,* and there condemned and sold, and the prize money distributed among the captors.

While the *San Francisco de Paula* was proceeding on her voyage to *Carthagena,* from *Washington,* she captured the *Jane,* as before mentioned, which was then called *La Hija,* and was sailing under *Spanish* colours. *Rise* stated in his deposition, that when the brig was first chased, the privateer had no colours up; that she afterwards hoisted *American* colours, and on the brig's hoisting *Spanish* colours, the privateer hoisted *French* colours, under which she captured the *Jane:* that at the time of the capture, and before parting from the *Jane,* the deponent expressly informed the captain of the privateer that the brig and cargo belonged to the plaintiff, and was merely covered as *Spanish* property to prevent capture by the *English,* and that, therefore, they had no right to capture her; but the captain refused to give her up, and told the deponent that he might inform his owner, when he got to *New-York,* that he had been captured by a *French* pirate; that the deponent was unable to learn from the captain, or people on board of the privateer, what was her name, or whether she acted under any commission; and it was not pretended by them that she had a commission; and it was his belief that she had none. Evidence was produced on the part of the defendant to show that the capture was made under *Carthagena* colours; and it was stated by a witness

that *Rise*, after the capture of the brig, told him that he was only a passenger on board, and had no interest in her; and that he heard him say that she was *Spanish* property, and sailed with *Spanish* papers. *Ferrand*, one of the lieutenants of the *San Francisco de Paula*, was put on board the brig as prizemaster, with five men, and was directed, by Captain *Auris*, to proceed to the *United States*. *Rise*, with the greater part of the crew of the *Jane*, was afterwards put on shore on the island of *St. Domingo*, whence he returned to the *United States*.

*Ferrand*, after leaving the privateer, endeavoured to disguise the brig by painting her, and fabricated papers for her; and on arriving at *Beaufort*, in *North-Carolina*, called her the *San Antonia*, and passed himself by the name of *Don Pedro Gonzales*, and other precautions were taken to prevent discovery. *Francis La Motte*, a merchant of *Newbern*, in *North Carolina*, stated, in his deposition, that in the beginning of *May*, 1813, a brig, under *Spanish* colours, commanded by a person calling himself *Don Pedro Gonzales*, arrived with a cargo at *Beaufort*; that she was furnished with *Spanish* papers for both vessel and cargo, purporting that she had sailed, or cleared, from *Campeachy*; that *Gonzales* applied to the deponent to take charge of the brig and cargo, and informed him that he had sailed from *Campeachy*, bound for *New-York*, but had put into *Beaufort*, through fear of *English* cruizers; that the brig and cargo were regularly entered at *Beaufort*, as a merchant vessel and cargo, in the ordinary course of trade. That the cargo was landed and taken to *Newbern*, where part of it was sold; another part was shipped, by the direction of *Gonzales*, to *Norfolk* in *Virginia*, and the residue remained with the deponent; that two or three days after this shipment, the defendant arrived at *Newbern*, and stated to the deponent, that the brig and cargo belonged to him, and had been taken by his privateer, which the deponent understood was called the *Whiting*. On the deponent's expressing his surprise to *Gonzales* that he had not been informed of this circumstance, *Gonzales* delivered the deponent a letter from *Auris*, the captain of the privateer, wherein the defendant was recognised as owner of the privateer, and *Gonzales* was directed to consign his vessel and cargo to the deponent, which letter the deponent retained, but some time after delivered it to an agent of the defendant, who requested it from him. *La-motte* further stated, that from the time of the arrival of the de-

fendant at *Newbern*, he assumed the whole direction of the brig and cargo; that the deponent, by his orders, forwarded the indigo, which constituted part of the cargo, to *Baltimore*; and that the defendant repeatedly declared to him that he was owner of the privateer which had taken the brig and cargo, and claimed them as his property. The defendant, soon after his arrival at *Newbern*, directed the deponent to load the brig with a return cargo for *St. Thomas*; and the deponent accordingly purchased and loaded her with a cargo. In the depositions of *Leroy* and *Guyot*, before alluded to, circumstances and admissions were stated, tending to show that *La Motte* knew the character of the brig *Jane* before the arrival of the defendant at *Newbern*.

The brig having been discovered, while at *Beaufort*, by Captain *Rise*, after she had been loaded with a return cargo, was libelled at the suit of the plaintiff, in the district court of the *United States*, for *Pamplico* district, *North-Carolina*; and that court decreed that the brig *Jane*, her tackle, apparel, furniture, and boats, and the pieces of fustic wood, and horns, part of the cargo on board of the brig, at the time of the capture, in the possession of the marshall, be restored to the libellant; and that he recover of *Gonzales*, for damages sustained by reason of the detention of the brig, 1,000 dollars, and that the cargo then on board should be sold, and that the proceeds, after payment of costs, should be paid to the libellant towards the satisfaction of these damages; and the court reserved its decision upon the claim of the libellant for damages for the value of the cargo at the time of the capture. It did not appear that any decision was ever made upon the point reserved.

The counsel, for the defendant, moved for a nonsuit, on the ground that a trover and conversion were not proved; that the cause of action had been adjudicated upon by the district court in *North-Carolina*, and that it was a question exclusively of admiralty jurisdiction. But the motion was overruled, and the judge charged the jury as follows: First, if the jury, from the evidence, believed that the schooner *San Francisco de Paula* had on board a commission, or letter of marque, under the government *de facto*, of *New Grenada*, or *Carthagena*, and claimed to act under it in capturing, and, also, in the subsequent disposition of the brig *Jane*, then the plaintiff was not entitled to recover, because the question of prize, or no prize, involving the validity of that commission, belonged exclusively to admiralty

jurisdiction. Second. If it were proved that the schooner *St.* ALBANY,
*Francisco de Paula* had that commission on board, and acted August. 1817.
under it in capturing the brig *Jane;* but that, instead of treating BARTLETT
her as a prize of war, as by conducting, or endeavouring to car- v
ry her to a port of the captors, or of their allies, for the purpose NOVION.
of adjudication before a competent tribunal, the brig was, in
fact, carried by the captors into the *United States,* then at peace
with *Spain,* in the disguise of a private merchant vessel, and
claimed, and disposed of there, by the defendant, as his private
property, then the defendant was, in judgment of law, to be
considered a trespasser *ab initio,* and the plaintiff was entitled
to recover the value of the cargo, at the time and place of cap-
ture, with such additional damages as would be equal to the in-
terest thereon ; and in determining such value, the jury ought to
allow the *New-York* prices of the cargo, deducting a reasona-
ble premium of insurance from the place of capture to *New-
York;* the restoration of the brig, and the avails of the cargo,
or any part of it which the plaintiff had received, of course, go-
ing in mitigation of damages. Third. If the jury believed, from
the evidence, that at the time of the capture, the schooner *St.
Francisco de Paula* had no commission as a letter of marque,
then, in judgment of law, the taking of the brig was an act of
piracy, for which the captors were responsible *criminaliter,* in
the federal courts only ; but the private injury was not merged
in the felony ; and that, as it regards the civil remedy, this court
had jurisdiction, and the plaintiff was, in that case, entitled to
recover the value of the cargo according to the rule above men-
tioned, it being understood throughout, that the plaintiff was
bound to prove property in himself, and that the defendant did,
or procured to be done, the injury complained of, or that he
adopted the act of seizure by his subsequent disposition of the
property. With these directions, the judge left the cause to the
jury, who found a verdict for the plaintiff, for 29,687 dollars,
and 80 cents, damages. The defendant's counsel excepted to
the opinion of the judge.

The case was argued on the bill of exceptions, at a former
term.

*Burr,* for the defendant. The plaintiff's vessel was taken
*as a prize.* It being then a question of prize or no prize, admit-
ting that the capture was illegal or piratical, the court of admi-

ralty has sole and exclusive jurisdiction of the question. The courts of common law have no jurisdiction at all. This was laid down as the clear and established law in the case of *Le Caux* v. *Eden.** *Buller,* J., in that case, went into a full examination of all the authorities on the subject, and showed. most conclusively, that such had always been the law. The same doctrine was laid down by Lord *Mansfield,* in the elaborate opinion delivered by him in the case of *Lindo* v. *Rodney,*† and this doctrine has been repeatedly recognised and sanctioned, as clear law, by the courts in this country. In the case of *Doane's Adm.* v. *Penhallow,*‡ in the court of C. P., of *Philadelphia,* Judge *Shippen,* (1787,) held, that though the question before the court was not directly a question of prize, yet being a question arising upon the immediate and necessary consequence of the vessel being taken *as prize,* it was solely and exclusively of admiralty jurisdiction. In *Ross* v. *Rittenhouse,*§ decided by the supreme court of *Pennsylvania,* (1792,) all the judges held the same language. *Simpson* v. *Nadeau,** before the *Court of Conference,* in *North Carolina,* (in 1801,) is a strong case in point. A *French* privateer captured a brig belonging to the plaintiff, an *American* citizen, under the *pretence of prize,* and carried her into *St. Jago de Cuba,* and, without any regular form of condemnation, sold the brig and cargo. The plaintiff brought an action of *trover* against the defendant, the owner of the privateer. All the judges were clearly of opinion that the court had no jurisdiction of the cause; it being a question of prize, or of capture under pretence of prize, it could only be determined in a court of admiralty.

The same question came before the supreme court of *Pennsylvania,* in the late case of *Cheriot* v. *Fonsat,*† (1809,) in which it was held, that a court of common law had no jurisdiction of an action brought to recover property which had been condemned *as prize,* for a violation of a municipal law of *France,* interdicting trade with her revolted subjects in *St. Domingo.* In that case, the vessel of the plaintiff, an *American* citizen, was captured by two *French* privateers, and carried into *St. Jago de Cuba,* and there condemned as lawful prize by a commissary of marine, or agent of the *French* government, under an *arrete* of the *Captain General* of *St. Domingo,* by which all vessels, found communicating with the places on the coast occupied by the rebels, should be seized and condemned, with their cargoes,

ALBANY,
August, 1817.

BARTLETT
v.
NOVION.
* Doug. 594.
601, 602.

† Doug. 613. n.

‡ 1 Dall. Rep.
218. 221.

§ 2 Dall. 160.

* Cameron and
Norv. Rep. 115.
143.

† 3 Binny's Rep.
220.

*Slosson* and *D. B. Ogden*, contra. A bill of exceptions does not bring the whole matter into examination, but only the particular points excepted to, and where the opinion of the judge is against the party who makes the exception.\* The first part of the judge's charge in this case being in favour of the defendant, does not come in question. We shall endeavour to show, first, that this court has a general jurisdiction; and, secondly, that this case does not make an exception.

1. It is not pretended, if this is a mere question of *prize* or not, that this court has jurisdiction. All the books show that such a question belongs solely and exclusively to an admiralty court. But it is equally well settled that courts of common law have jurisdiction, generally, in all cases of a wrongful taking on the high seas. In *Lindo* v. *Rodney*,† Lord *Mansfield* lays it down, that a thing being on the high seas does not exclude the jurisdiction of the common law courts. That for seizing, stopping, or taking a ship on the high seas, not as prize, an action lies. It is the nature of the question, not the locality, or place of taking on which the jurisdiction depends. The authorities are numerous to this point.‡

*Brown*, in his treatise on the law of the admiralty,§ after examining the authorities on the subject, says, " the proper distinction seems to be, that if the suit be *in rem*, for the restitution of the ship itself, the suit should be in the admiralty; if for damages only, at common law." The two courts have, in many cases, in regard to *torts* committed on the high seas, concurrent jurisdiction. In *Shermoulin* v. *Sands*,‖ Lord *Holt* says, " The common law is the controlling jurisdiction, and the party must well entitle himself to draw a cause from it." The common law court is the superior, having power to grant prohibition to the admiralty.

*Prima facie*, then, this court has jurisdiction of this case. The defendant, to make out his exception, and to draw his case from this court, alleges, first, that it is a question of prize or no prize; and, secondly, if not, it is a case of *piracy*. The exception must be clearly supported, or the defence fails. There is nothing in the constitution or laws of the *United States*, that alters or takes away the common law, or the rights of parties, as they before existed. The judicial power of the *United States* extends to all cases of admiralty and maritime jurisdiction.\*\* The act establishing the judicial courts of the *United States*,†† declares,

ALBANY,
August, 1817.

HALLETT
v
NOVION
\* 8 Johns. Rep.
507. 2 Caines,
168.

† Doug. 614, 615.
n. 1.

‡ See also *Mos-lyn* v *Fabrigas*, *Cowp.* 179. *Nightingale* v. *Bridges. Carth.* 131. 1 *Shower*, 135. *Hughes* v. *Cornelius*, 2 *Show.* 232. *T. Raym.* 473 *Beaks* v *Terrill*, *Shower* 6 *Le Carx.* v *Eden*, *Doug* 604. and the authorities there cited.
§ 2 *Bro Adm. Law.* 107. 116. 122 *Bridgman's case*, *Hob* 12. 212, 213.
‖ 1 *Ld. Raym.* 271.

\*\* *Const.* U. S. art. 3.
†† 1 *U. S. L.* 4T. 1 *Cong.* 1 sess. ch. 20.

that the district courts of the *United States* shall have exclusive original cognisance of all civil causes of admiralty and maritime jurisdiction," &c., "saving to suitors, in all cases, the right. of a common law remedy where the common law is competent to give it."

Is this, then, a question of prize or not? What is prize? It is, in the language of Sir *Wm. Scott*,* "a taking of goods, *jure belli*, on the high seas, out of the hands of an enemy." It must be a *hostile* capture, in a public war between two sovereigns or independent states. It is essential, therefore, that the party alleging a *prize*, should show a regular commission or authority to seize, as prize, from the belligerant to an individual competent to receive and act under such commission. It is a pre-requisite that the defendant should show a valid commission; and this court must collaterally examine into the question, not whether there was a valid prize or not, but whether the *question* of prize or no prize arises in the case. Now, this question cannot arise, if the sovereigns or states were not at war; if no commission existed, or if the person claiming to act under a commission was legally incompetent to do so. The court must examine so far as to see whether the foreign court had jurisdiction.† It is bound to inquire into the competency of the authority under which the plaintiff's property has been taken. We contend, then, 1. That there was, in fact, no commission. 2. That the government at Carthagena was incompetent to grant one. 3. That this defendant was not competent to accept it.

1. A taking on the high seas by an individual without a commission, is a *trespass*. It is not a capture as prize. A private armed cruiser, without a commission, is a pirate; for it belongs only to the public authority of a nation to direct its forces and carry on war. Was there, then, in fact, any commission on board the *San Francisco de Paula?* [Here the counsel went into the evidence given at the trial, and concluded that there was not sufficient *legal* proof of the existence of a commission.] In case of a public ship of war, no commission need be shown; but here *Novion*. residing in the *United States*, who were at peace with *Spain* and her colonies, fitted out his vessel, and sailed ostensibly on a mercantile voyage. There can then be no presumption in favour of his having a commission. From the report of the case of *Ridley* v. *Egglesfield*,‡ in *Levinz*, it does not appear that the defendant had a commission, but in the report of the case by

* *The Two Friends*, 1 *Rob. Adm.* 283.

† *Rose* v *Himely*, 4 *Cranch.* 269. *Wheelwright* v. *Depeyster*, 1 *Johns. Rep.* 484, 485 *Talbot* v. *Jansen*, 3 *Dald.*, 159.

‡ 2 *Lev.* 25.

*Saunders,*† it is stated that the plaintiff's ship was taken by a private *Scotch* man of war, as a prize, supposing her to be *Dutch*, and carried into *Scotland*, and there condemned by the court of admiralty as lawful prize. The meaning of Lord Ch. J. *Lee*, in the case of *Rous* v. *Hassard*, cited by Lord *Mansfield* in *Livingston* v. *M'Kenzie*, and by *Buller*, J., in *Le Caux* v. *Eden*,‡ undoubtedly is, that for a taking, without commission, on the high seas, trespass lies at the common law; but for a taking under a commisson *as a prize*, the court of admiralty alone has jurisdiction. So in *Vandervoort* v. *Thompson*, cited also in *Le Caux* v. *Eden*, the defendant had letters of *marque*.

2. *Carthagena* was not a sovereign power capable of granting a commission. She is a colony of *Spain*, in *arms* against the parent state; and it is for our government alone to decide on the fact of her being a sovereign state. This point has been settled in this court in the case of *Hoyt* v. *Gelston*.‡ The judge, in his charge, did not leave it to the jury to decide whether *Carthagena* was an independent government *de facto*, or not. The jury must have believed that there was no commission on board. Their verdict negatives the fact of her having a commission.

3. But admitting, for a moment, that *Carthagena* was an acknowledged government *de facto*, we contend, that the defendant, residing in the *United States*, could not, as it regards this country, accept a commission. He owed allegiance to the *United States*. He acted at his peril, and can derive no benefit or protection from any such authority.§ The act was illegal, not only as against the law of nations, but as expressly forbidden by an act of congress, passed the 5th of *June*, 1794,‖ and made perpetual by an act passed the 24th of *April*, 1800.** This act declares it to be a high misdemeanour, punishable with fine and imprisonment, as well as forfeiture, for a person, within the ports of the *United States*, to fit out, and arm, &c., any ship or vessel, with intent to employ her in the service of any foreign prince or state, to cruise or commit hostilities upon the subjects, citizens, or property of another foreign prince or state, with whom the *United States* are at peace, or to issue or deliver a commission within the *United States*, for that purpose." If the defendant, then, had a commission, it must *here* be regarded as utterly null and void.†† It is the same as if he had no commission. Can it be tolerated, that a person fitting

*Margin notes:*

ALBANY, August, 1817.

HALLETT v. NOVION.

† 2 Saund. 259.

‡ Doug. 635.

† 13 Johns. Rep. 139. 4 Cranch 272.

§ 3 Dallas, 133. 154.

‖ 3 U. S. L. 88. 3 Cong. 1 sess. ch. 50.
** 5 U S. L. 128. 6 Cong. 1 sess. ch. 35.

†† 3 Dallas, 152. 154.

out a vessel in one of our own ports, in direct violation of an act of congress, going on the high seas, committing trespasses, seizing the property of our own citizens, and bringing it into our ports, and converting it to his own use, without ceremony or form of law, shall not be subject to an action in our courts at the suit of the party injured? Even if the vessel had a regular commission, would this be suffered? If the first inception of the business was unlawful, must not every thing subsequently done be deemed unlawful here?

Again; admitting that the defendant had a legal commission, and acted under it, he did not proceed with the prize so as to entitle him to a condemnation. It has long been the settled law that mere capture alone does not vest the property in the captor. It must be followed by condemnation in the courts of the sovereign of the captor or his allies; and until such condemnation the property remains unchanged.*   In order to perfect the capture, and render it valid and effectual, certain rules of proceeding in cases of capture, have been laid down and adopted by all civilized nations.†   The captor must put the prize in a train for legal adjudication. He must carry her within the jurisdiction of his soverign. The commission produced requires him to do so, conformably to the general law of nations. Some of the crew must be left on board to ascertain the character of the captured vessel, and her papers must, also, be preserved. If these rules are not observed; if the captor does not pursue the course pointed out by the law of nations, he shows, by his conduct, that it was not his intention to act under his commission, or to seize as prize, but piratically. The defendant took out all the crew from the plaintiff's vessel, he destroyed or suppressed her papers; forged a new set of papers, sent her, under a false character, into a neutral port, and there proceeded to sell and dispose of the property, without any form of judicial proceedings whatever. Here, then, is not a case of mere irregularity, but the whole course of the defendant's conduct shows that he did not intend to capture *as prize;* that he waived his commission.

Admitting that by a seizure of the goods of a belligerent on the high seas, the hostile captor acquires an inchoate right of property; yet, where *neutral* property is taken, he acquires no right whatever; the property is not at all changed. He can only retain possession *by force.* The moment he lets go his

*Margin notes:*
* *Assicvedo v. Cambridge,* 10 Mod 79. *Goss v. Withers, Burr.* 696. *Flad Oyen.* 1 Rob 11d. *Hendrick and Maria* 4 Rob. 35. *Wheelwright v. Depeyster,* 1 *Johns. Rep.* 412.
† 1 *Johns. Rep.* 482. *Answer to the Prussian Mem al.* See *Appx. Chitty's L. of N.* 302 3 *Dallas,* 168. 4 *Cranch,* 514.

hold, or abandons his belligerent character, his right as captor ceases.* If he does not, or can not retain his hold, the property reverts to the original owner. Here the defendant, instead of continuing to exert his hostile power, and of proceeding to perfect his title to the prize, suffers the captured vessel to go at large. He abandons his *prize.* The belligerent occupation having ceased, the holder, as it regards the owner, is a trespasser.

In *Beake* v. *Tyrrell,*† which was an action of trespass for taking a ship, &c., the defendant pleaded that he was captain of a man of war, and took her on the high seas, *as prize*, and carried her into ———, and she was there condemned, in the admiralty, as prize. *Holt*, Ch. J., said, " it doth not appear how this ship came to be a prize ; it doth not appear there was any cause to seize her as such ; nor shown that there was any war." So, in this case, we say, no *war* has been shown. There can be no *war* except between sovereign states.

Next, as to the second ground of exception, or defence, that the taking was *piratical.* It is not our object to contend that the act was *piracy*. There are many acts of depredation on the high seas which are not piratical. It does not follow, that because the taking was by force, that it was piratical. It may be so or not, according to circumstances.‡ All we assert is, that the defendant cannot set up his own *piratical* conduct as a defence in this action. He cannot allege his own crime, or fraud, to shield himself from responsibility. It is a well-settled principle, that " no man shall set up his own fraud, or iniquity, as a ground of action, or defence.§ *Nemo allegans suam turpitudinem est audiendus.* Could the defendant plead to the jurisdiction of this court, that he took the property feloniously, or piratically, and, therefore, this court had no cognisance of this action ?

But supposing it to be piracy, yet this action lies. The civil remedy is not merged in the felony.‖ *Piracy* is robbery on the high seas, and may be punished by any nation. In *England*, originally, the crime was punishable only in the admiralty ; but by the statute 28 *Henry* VIII.. c. 15., it was triable by commissioners of *oyer* and *terminer*, according to the course of the common law.** By the law of the *United States*, piracy is made triable by jury before the circuit court, and is punishable with death. The rule, as to the merger of the private right in the felony, which is founded on principles of public policy, does

ALBANY,
August. 1817.

HALLETT
v.
NOVION.

* 2 *Vatin* 121.
2 *Azuni* 237. 1 *Emerig* 440. 4 *Cranch*, 294. *Binkershoek*, J. B. ch 4 *The Polly,* cited 4 *Rob* 179 2 *Asuni*, 273, 274. 1 *Emerig.* 502 505. 507 1 *Acton's Rep.* 33.
† 1 *Show.* 6.

‡ 3 *Dallas*, 164.

§ 3 *Dallas*, 15?. 3 *Bos.* & *Pull.* 36. 3 *Cranch.*, 248.

‖ 1 *N. R. L.* 499. 36 sess. ch 8. s. 20 5 *Term. Rep.* 175.

** 3 *Co. Inst.* ch. 49 111, 112. 4 *Bl. Com.* 71. 268.

*3 Inst. 111,
112.
† 4 Bl. Com.
362, 363.

‡ 2 Burr. Rep.
694. 3 Dall. 160.
16 Vin. Abr 350.
Pirates, ch 1. s.
3. s. 4. 10 Mod.
79.

§ 4 Inst. 152,
153, 154.

‖ Hob. 78.

not apply to a case of *piracy*, which is not a *common law*, but a civil law felony.* After the statute 28 *Henry* VIII., a pardon of all felonies did not extend to piracy. At common law, the party robbed was obliged to bring an *appeal* in order to have his goods again, but no *appeal* lies in a case of piracy.† The reason why the civil remedy was merged in the felony at common law, was to prevent compounding for the offence, and to compel the party to bring his *appeal*. But piracy not being a common law felony, the reason of the common law rule does not apply.

It is a settled principle that property, in goods, taken by pirates, is not changed, but remains in the owner.‡ In *England*, then, as well as in this country, the offence *criminaliter*, is considered distinct from the civil injury. If the right of the owner remains, why not the remedy ? The private, or civil remedy in the *admiralty* court must be on the *instance* side of the court, for a restitution of the goods, *or thing itself*. But where, as in this case, the claim is for a reparation in damages for depriving the party of his property, the common law court is the proper tribunal. In *Palache's* case,§ it was resolved by the court of K. B., that the goods, taken at sea, being brought within the realm, if the *Spaniard* sued for them *civiliter* in the court of admiralty, a *prohibition* should be granted ; for it should be determined by the laws and statutes of *England,* and not by the civil law. So, in the case of *Don Diego Serviento de Acuna,* the *Spanish* ambassador, against *Joliff* and others,‖ the plaintiff, as procurator general for all the subjects of the King of *Spain,* having libelled, in the admiralty court, for two ships and their cargoes, belonging to *Spanish* subjects, charging that *Joliffe* and *Tucker, Piratœ, in alto mare, more bellico, dictas naves agressi sunt, et per vim et violentiam,* took them ; and that they were brought into some part of *Ireland,* and there came to the hands of *Bingley,* who converted them to his own use, not saying where, and who refused to render them on request, &c. ; the court of C. B unanimously awarded a *prohibition,* as regarded the suit against *Bingley.* Though the charge was that the defendants were pirates, yet it was a mere action of trover and conversion, or for taking by *force and violence,* and the proceeding was *civil,* and not criminal.

The facts proved in this case fully show a *conversion* by the defendant, on land, of the property of the plaintiff.

*Colden*, in reply, insisted, that whether the *San Francisco de Paula*, had a valid commission or not, or whether the government under which it issued was competent to grant it or not, were questions belonging to the admiralty court which had exclusive cognizance of the principal question, *prize* or no *prize*. Though a court of common law cannot inquire whether the government issuing the commission, is a sovereign and independant state or not, yet an admiralty court, in deciding the question of prize, may recognise the authority of a government *de facto*. But it appears from the case that the judge, in his charge, left it to the jury to decide the question.

It is sufficient to oust the common law jurisdiction, that the taking was under pretence of prize. No matter whether the capture was lawful or not. The captured vessel was a *Spanish* vessel. The plaintiff had made her so. She had *Spanish* papers, a *Spanish* crew, and was sailing under *Spanish* colours, and she was captured as *Spanish* property, by a vessel cruising under a commission from a government *de facto*, at open war with *Spain*. Where the original cause, or question, as a taking on the high seas, belongs to the admiralty jurisdiction, it continues there, and every incidental and consequential matter belongs also to the same jurisdiction.*

Next, supposing the taking, in this case, to have been *piratical*, we contend that a court of common law has no jurisdiction. *Piracy* is taking the property of another on the high seas without authority, *animo furandi*. What would be felony if the act was committed on land, is *piracy* if done on the high sea. A *pirate* is one who roves the sea in an armed vessel, without any commission, or passport, from any sovereign, but solely on his own authority and with a view to appropriate to himself, without discrimination, every vessel he may meet.† In the case of the *Helena*,‡ the owner of a ship captured, by an *Algerine Corsair*, and sold by the *Dey* of *Algiers*, arrested her by a warrant out of the court of admirality, as being his property taken *piratically*, and not lawfully

The capture being on the high seas, is *prima facie* as prize, and the plaintiff must show that it was a marine trespass, to give the court jurisdiction. The defendant need not plead, that the taking was as prize, or piratical. It is enough that from the cause of action, the court see that it has no jurisdiction. To support an action of *trover* for goods taken at sea, the plaintiff

* 2 Bac. Abr. 178 179  Court of Adm.(B.)Ven- tris, 308  1 Lev. 243   Sid. 367. Roll. Abr. 530. Carth 475, 476. 3 Term Rep. 332. 1 H Bl. 476. 4 Term Rep. 382.

† 2 Azuni, 351. Part 2 ch 5 s. 3. 1 Dallis' Rep. 247   United States v. Tully, 2 East's, Cr. L. 796. ‡ 4 Rob. Adm. Rep.

ALBANY,
August 1817,

HALLETT
v
NOVION.
* 4 Inst 154.
† 1 Shom 6.
3 Mod, 194. S. C.
Comberbach, 120.
S. C.

must, besides a property in himself, show that his sovereign was at amity with the sovereign of the defendant.*   A marine trespass is where the taking is not *as prize*, or piratically. . What is said in *Beake* v. *Tyrell*,† if taken in reference to the facts before the court, amounts only to this, that being a seizure under a *municipal* law, and not as prize of war, the court of K. B. had concurrent jurisdiction of the cause.(*a*)   In *Wheelwright* v. *Depeyster*, the question of prize was not raised or considered.   The only point of inquiry was, whether there had been a valid condemnation or not, so as to give the purchaser a good title. The rules of proceeding in case of prize or capture, and the inquiry as to the validity of the commission of the captor, are all *prize* questions.

Again ; the judge referred it to the jury to decide, whether the defendant in making the capture, and in his subsequent disposition of the plaintiff's vessel acted under his commission or not. This cannot be correct.   It would be a most inconvenient rule, and extremely embarrassing to all captors.

If the courts of common law have no jurisdiction, of piracy, then that question was improperly referred to the jury.

*Slosson,* to show that using false or simulated papers, &c., to disguise the real character of the property, was not a fraud that would prevent the party from proving the real ownership, cited 2 *Rob.* 88, 89.   6 *Rob.* 1.   *The Flora.*—(*Cur. ad. vult.*)

THOMPSON, Ch. J., now delivered the opinion of the court. Several very important and difficult questions have been raised and discussed on the argument, which, according to the view . I have taken of the case, it becomes unnecessary for me particularly to notice.   That the brig *Jane*, and her cargo, were the property of the plaintiff at the time of the capture by the privateer, was very satisfactorily proved ; and the conversion by the defendant was equally well established.   The only question of doubt in the case was, whether this court has jurisdiction of the cause, or whether it is a case exclusively of admiralty jurisdiction.   That courts of common law have cognizance of marine trespasses, is a point no where questioned.   It is not the

(*a*) The case of *Beake* v. *Tyrrell* is well commented on and explained by *Jocelyn, arguendo,* in the case of *Simpson* v. *Nardeau,* (*Cam.* and *Norv. Rep.* 136, 137, 138.,) in which the question of jurisdiction is very fully and ably discussed.

place, but the nature of the question that will determine the jurisdiction of the court.

*Le Caux* v. *Eden*, (*Doug.* 594.) is a leading case on the question whether common law courts have jurisdiction when the question is prize or no prize. It is there expressly admitted, that trespass will lie at common law, for taking a ship on the high seas : and the reason assigned in all the cases on this subject, why common law courts have not cognisance of the question, whether taken as prize or not, is because prizes are acquisitions *jure belli*, and the *jus belli* is to be determined by the law of nations, and not by the particular municipal law of any country. Whenever, therefore, the rights of the parties are to be governed by the municipal law, and not by the law of nations, it would seem to follow, as matter of course, that common law courts have jurisdiction of the case. In the act of congress establishing the judicial courts of the *United States*, there is a saving to suitors, in all cases, of the right of a common law remedy when the common law is competent to give it. If courts of common law have cognizance of marine trespasses, then, *prima facie,* this court has jurisdiction, and it is matter of defence, and to be shown on the part of the defendant, that this jurisdiction is taken away. When this defence shows and involves in it a violation of an act of congress, it appears to me to be going great lengths to yield our jurisdiction. This is surely a question depending on the municipal law of this country, and not upon the law of nations ; and the reason for sending the parties to a court of admiralty ceases. A court of common law is as competent to try the question as a court of admiralty. That the privateer, in this case, was fitted out in direct violation of the act of congress cannot be denied. The act of the 5th of *June,* 1794, and which is made perpetual by an act of the 24th of *April,* 1800, makes it a misdemeanour, and subjects to a penalty any person who shall, within any ports, harbours, bays, rivers, or other waters of the *United States,* fit out and arm, or attempt to fit out and arm, or shall, knowingly, be concerned in furnishing, fitting out, or arming any ship or vessel with intent that she shall be employed in the service of any foreign prince or state to cruise or commit hostilities upon the subjects, citizens, or property of another foreign prince or state with whom the *United States* are at peace, or shall issue or deliver a commission within the territory or jurisdiction of the *United States,*

for any ship or vessel, to the intent that she may be employed as aforesaid. In the case before us, it is very satisfactorily proved that the privateer *Whiting*, which captured the plaintiff's brig, was fitted out at *Washington*, in *North Carolina;* and that the commission to cruise was put on board while she was within the jurisdiction of the *United States*, which commission authorized cruising against the *Spaniards* with whom the *United States* were at peace.

If it became necessary to inquire whether the government at *Carthagena* was competent to issue the commission under which the privateer acted, this might most properly belong to admiralty jurisdiction. But whether the commission issued from competent authority or not, cannot be a subject of inquiry ; and, indeed, this is altogether immaterial, for the very putting it on board within the jurisdiction of the *United States*, was illegal, and the commission a nullity. The defendant cannot be allowed to set up, as a justification or excuse for his trespass, an act made penal, and a criminal offence, under the law of congress. To inquire into this matter is not entertaining the question whether *prize or not.* This is a point depending entirely on our own municipal law, with which the law of nations has no concern. It is no answer to say, that the defendant may be proceeded against for the penalty and offence prescribed by the statute. This is a prohibitory statute, and every act done against it is not only illegal, but absolutely void. It would, in my judgment, be a dangerous doctrine, and subversive of all sound rules and principles, to listen to a defence, founded on a violation of this act of congress. Courts of law will not assist an illegal transaction in any respect, or permit it to be set up as a protection. Although this act contains no express prohibition, yet it is a well-settled rule that a penalty implies a prohibition. (*Carthew,* 252.) I can discover no reason whatever, why courts of common law are not as well adapted to inquire into a violation of this act, as courts of admiralty. It is surely not enough to take away our jurisdiction, barely *to pretend* that the taking was *as prize.* Suppose no commission had been on board at all, or the captors were acting under a forged commission, without any pretence that it had been granted by any government or sovereignty whatever, would it not be competent for courts of common law to take cognisance of such inquiries ? A vessel cannot be said to be captured, as prize,

unless the act be done *bona fide*, and under a commission, at least, *prima facie*, valid, and where the responsibility of the government, which must be settled according to the law of nations, is involved. In such case, there is a great propriety in sending a party to a court of admiralty jurisdiction for redress. But not so, where our own municipal law furnishes the rule by which the claim, and rights of the parties must be tested. The illegal fitting out of this privateer, in direct violation of the act of congress, precludes the defendant from setting up the claim or pretence, that the taking was as prize : and it is upon this ground alone that I place my opinion that this court has jurisdiction of the cause. All the facts which show that the fitting out of the privateer was directly in the face of the act of congress, appear on the bill of exceptions; and we are called upon to pronounce the law upon those facts. Putting out of view the question of prize, it is not denied that the plaintiff has shown enough to entitle him to recover; and the rule of damages adopted by the jury has not been questioned. The opinion of the court, therefore, is, that the plaintiff is entitled to judgment.

Spencer, J., dissented. He observed that the verdict of the jury being generally for the plaintiff, without any special finding of the facts, the court must examine the opinion of the judge as expressed to the jury; and if the law was not correctly laid down, a new trial must be awarded, unless, indeed, admitting all the facts proved by the defendant to be true, the taking of the plaintiff's vessel was a marine trespass, and not as prize of war.

The only point for our decision is, whether, as a court of common law, we have jurisdiction of this case. It cannot be questioned that if the plaintiff's brig was taken as prize of war, this court has no jurisdiction. I believe this proposition has never been doubted since the cases of *La Caux* v. *Eden,* (*Doug.* 526.,) and of *Lindo* v. *Rodney,* (*Dong.* 591., note 1.) In the latter case, we have the authority of Mr. Justice *Buller,* " that there is a current of authorities from the time of Queen *Elizabeth,* to the present time, all of which agree that the admiralty has jurisdiction, not only of the question of prize or not prize, but of all its consequences." He cites the case of *Rous* v. *Hazard,* argued at the *Cockpit,* in 1749, and determined by Ch. J., *Lee,* who held, with the concurrence of the court, " that though

ALBANY,
August, 1817.

HALLETT
v.
NOVION.

for taking a ship on the high seas, trespass would lie at common law; yet, when it was taken as prize, though taken wrongfully, though it were acquitted, and though there was no colour for the taking, the judge of the admiralty was judge of the damages and costs, as well as of the principal matter; and if such an action was brought in *England*, and the defendant pleaded not guilty, the plaintiff could not recover." Mr. Justice *Buller* assigns the true reason, why the question of prize or no prize, was solely conusable in the admiralty; " prizes are acquisitions *jure belli*, and the *jus belli* is to be determined by the law of nations, and not by the particular municipal law of any country." Lord *Mansfield* held the same doctrine in *Lindo* v. *Rodney*. " A thing," he said, " being done on the high seas, does not exclude the jurisdiction of the common law; for seizing, stopping, or taking a ship on the high sea, *not as prize*, an action will lie; but for taking as prize, no action will lie, the nature of the question excludes, not the locality." The same doctrine was reiterated in *Smart* v. *Wolfe*, (3 *Term. Rep.* 344.,) and the same principles were recognized in the court of appeals of *North-Carolina*, in *Simpson* v. *Nardeau* (*Cameron* and *Norwood*, 115.) In that case, one of the points relied on arises in this case, that is as to the conduct of the captors after the capture; and it was contended, that by such after conduct the defendant became a trespasser *ab initio*. Judge *Hall* observes, that to ascertain the merits of that argument, the court must have recourse to the usages and regulations between us and *France*; and that, to go in search of these, would lead the court out of its course; they exclusively belong to the prize courts.

In the second proposition laid down by the judge to the jury, he instructed them that if the *San Francisco de Paula*, had a *Carthagenian* commission on board, and acted under it, in capturing the plaintiff's brig, the subsequent conduct of the captors in not proceeding against the brig as a prize, but bringing her into the *United States* under the circumstances she was brought in, and selling her as the defendant's private property, would render the defendant a trespasser *ab initio*, and the plaintiff would be entitled to recover. I repeat it, that the jury may have founded their verdict on this part of the direction, and, therefore, we cannot conclude, from the finding, whether the capture was as prize or not. There is abundant proof in the bill of exceptions, that the schooner had a *Carthagenian*

commission on board, and that her captain and crew professed, in making the capture, to act under it. They took forcible possession of the brig, and her captain and crew were taken out. This appears to me either a capturing as prize of war, or an act of piracy; and as the jury have not pronounced it to be the one or the other, I am relieved from the necessity of examining the question, whether courts of common law have jurisdiction in cases of *piracy*; and thus the point to be decided is narrowed down to this, whether the subsequent conduct of the captors, admitting the capture to have been as prize, will render the act of capture a trespass *ab initio*, and give a court of common law jurisdiction.

I can discover no principle of law to warrant this; if the principal question, of prize or no prize, is exclusively of admiralty jurisdiction, how can it be that a court of common law, proceeding according to the municipal law, and not the law of nations, and, confessedly, having no conusance of the principal question, shall assume jurisdiction over the principal question, by the application of its own peculiar law to the incidents of the main question?

It is as exclusively appurtenant to the admiralty to determine whether the subsequent treatment of the prize, invalidates the capture, as it is to decide whether the capture is valid or not. It requires the same application of the laws and usages of nations to the posterior conduct of the captors, in determining whether the captured vessel has ceased to be prize, as in the primary question of prize or not. In the case of *Rous* v. *Hazard*, Chief Justice *Lee* held, that where the captured vessel was acquitted in the admiralty, the court of common law was equally excluded from jurisdiction, the sentence not altering the nature of the original taking; it being a taking as prize, the common law could not notice it as a trespass. So, here, if the capture was as prize, the common law cannot notice it as a trespass. Every principle which excludes the jurisdiction of a court of common law, on the question of prize or no prize, equally excludes it in every stage of the business; and it does not belong to this court to apply the principles of the municipal law to any of the consequences of a prize, to ascertain whether the captured property retains, or has lost that character.

I understand my brethren as not contesting the soundness of the principles I have here advanced, but that the decision of this

cause, in favour of the plaintiff, rests on the fact, that the *San Francisco de Paula* had been fitted out in the *United States*, contrary to the 3d section of the act of congress of the 5th of *June*, 1794; and that the original fitting out being unlawful, the capture of the plaintiff's brig must necessarily be so. There is no doubt that the fitting out of this privateer was unlawful; it was a high misdemeanor, subjecting the offender to fine and imprisonment, and the vessel to forfeiture. But I cannot perceive that this precludes the question of jurisdiction. The act is silent as to the consequences to result from a capture by a vessel thus fitted out; and it seems to me that it cannot be doubted that a vessel though armed and fitted out in violation of that act, may take a prize. It is another question, whether it would be a valid capture; and in the discussion of that question, in an admiralty court of the *United States*, it might well be urged, and with an overwhelming effect, that the capturing vessel had no right to cruise or capture. This could not be objected against the captor in the courts of admiralty of any other nation, for those courts would not carry into effect the penal laws of another country. These considerations, however, do not belong to this court; it is immaterial what we may think of the illegality of the capture complained of; we have no power to entertain the question, or to afford redress; and the arguments addressed to us are misdirected.

The plaintiff is not without remedy, if his rights have been invaded; I only insist that he has applied to the wrong *forum.*

YATES, J., declared himself to be of the same opinion.

Judgment for the plaintiff.