## Case No. 6,491.

### HILL et al. v. The GOLDEN GATE.

### JOHNSON et al. v. The AMBASSADOR.

[6 Am. Law Reg. 273.]

Circuit Court, E. D. Missouri. April Term, 1857.[1]

MARITIME LIEN—SUPPLIES—DISCHARGE—JUDICIAL SALE.

1. It is settled that there can be no lien by the general maritime law for materials or supplies furnished a ship in the home port.

[Cited in Taylor v. The Commonwealth, Case No. 13,788; The Red Wing, 14 Fed. 869.]

2. Hill v. The Golden Gate [Case No. 6,492], opinion by Wells, J., affirmed.

3. A judicial sale in a proceeding in rem will discharge maritime liens, whether general or statutory, in whatever jurisdiction it may be decreed.

4. The operation of the boat acts, on the Western rivers, considered. The cases cited and commented on.

5. The foreign or domestic character of a vessel must be determined by the residence of her owners.

6. If a vessel is navigated by charterers, who have exclusive control of her, they are to be deemed the owners pro hac vice.

[Cited in Harney v. The Sydney L. Wright, Case No. 6,082a.]

7. A general maritime lien cannot be divested by the legislature of a state.

[Cited in The Skylark, Case No. 12,928; The E. A. Barnard, 2 Fed. 722.]

8. An admiralty sale alone can judicially pass a title to a vessel discharged of liens.

[Cited in The Skylark, Case No. 12,928.]

[Appeals from the district court of the United States for the Eastern district of Missouri.

[Libels by Hill & Conn and others against the Golden Gate, and by Johnson and others against the Ambassador, to enforce liens for supplies. The libel of Hill & Conn and others was dismissed in the district court (Case No. 6,492), and the various libellants appeal.]

Before CATRON, Circuit Justice, and TREAT, District Judge.

TREAT, District Judge. These cases are appeals in admiralty. As they involve, to some extent, the same legal propositions, they will be considered together. The Golden Gate was owned in Indiana, enrolled in Kentucky, and chartered in Missouri. By

---

1 [Affirming Case No. 6,492.]

the terms of the charter-party, the exclusive management and control, as well as the profits, of the vessel, were vested in the charterers. Whilst the latter were engaged in navigating her, the libellants furnished, at St. Louis, the supplies in question. After these supplies were furnished, the vessel was seized under the Missouri boat act, and the claimant became the purchaser at the judicial sale ordered by the St. Louis court of common pleas. The libellants did not present their demand for allowance by said court pursuant to the boat act. The Ambassador was enrolled at Cincinnati, and her owner resided at Newport, in Kentucky, on the opposite side of the Ohio river. All of the business of the vessel was transacted by him in Cincinnati, of which the town of Newport, although in another state, is, in business matters, practically a suburb. The libellants' demand is for labor and materials furnished in Cincinnati. This vessel had been sold under a decree in admiralty, by the United States district court of Ohio, and, according to the terms of sale, the United States marshal had taken of the purchasers a mortgage to secure the time payments. The mortgagee and purchasers put in answers and claims. The demand of the libellants accrued after said sale and mortgage.

The well-considered and elaborate opinion of Judge Wells, in deciding the case of Hill v. The Golden Gate [Case No. 6,492], in the district court, leaves but little to be added concerning the propositions there ably discussed by him. His clear and exhausting review of the authorities upon those points renders it unnecessary to repeat or re-examine them. It will be sufficient now, so far as those propositions are concerned, to state the conclusions at which this court has arrived, and to present some of the more obvious reasons on which those conclusions are based.

It has been settled, and is therefore not open for review in this court, that there can be no lien, by the general maritime law, for materials or supplies furnished a vessel in her home port. The General Smith, 4 Wheat. [17 U. S.] 443; Peyroux v. Howard, 7 Pet. [32 U. S.] 343; The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 390; Pratt v. Reed. 19 How. [60 U. S.] 359. It is admitted by the learned advocates, that the libellants have a lien by the general maritime law, if the home port of the Golden Gate was Louisville, Kentucky, (the place of enrollment,) or in Indiana, (the residence of her general owners;) and if the home port of the Ambassador was in Kentucky, (the residence of her owner at the time the repairs were furnished her at Cincinnati.) The first question, therefore, to be decided is, as to the home port of the Golden Gate—whether the supplies by the libellant were furnished to a domestic or foreign vessel. If St. Louis was her home port, then the libellants have no maritime lien; and the local lien given by the Missouri statute "concerning boats and vessels," has been lost, if the judicial proceedings in the court of common pleas divests or extinguishes the local or statutory liens created by that act.

By the United States statutes—acts of December 31, 1792, and of February 18, 1793 [1 Stat. 286, 305]—a vessel must be enrolled or registered as of the port at or nearest to which her owners, or managing owner resides, and the enrollment must state the residence of her owners. Hence the courts have held, according to a recognized rule in analogous cases, that the residence of the owners, as stated in the enrollment, is prima facie correct. It is not the port of enrollment that determines the character of the vessel, but the residence of the owners, and the enrollment is prima facie evidence of the latter fact. Where the enrollment, therefore, states the residence of the owners to be in another state, the vessel prima facie belongs to that other state. If the enrollment misstates the fact, the character of the vessel is not concluded by that misstatement, but the truth may be given in evidence for the benefit of the parties interested. The United States statutes are framed to meet the fact that the necessities of commerce have not required the establishment of ports of enrollment at every town or village, either on the sea-coast or navigable rivers of the Union, and consequently the owners of vessels may often reside at towns where there are no such established ports, or even in towns remote from navigation. The reason of the maritime rule with regard to liens, requires a disclosure of the residence of owners, and the policy of the United States laws also demands the enrollment or register of vessels used in the coasting or foreign trade. Documents required by law are presumed to give accurate statements of what the law requires them to authenticate. As it is admitted that neither the charterers nor general owners of the Golden Gate had any credit in St. Louis, that the supplies were necessary for the running of the vessel, and that, consequently, there was a necessity for relying on the credit of the vessel, within the rule laid down in Pratt v. Reed, 19 How. [60 U. S.] 359, the right of the libellants to recover depends on the decision of the question, whether the residence of the general owners, or of the charterers, under the facts in evidence, determines the character of the vessel. The district court held that, as the charterers were residents of St. Louis, and the supplies were furnished there for the purpose of victualling the vessel, St. Louis must be considered her home port with respect to this transaction. The case of Tree v. The Indiana [Case No. 14,165] sheds no light on the question; for it merely recognizes the rule, already stated,

with regard to the prima facie effect of an enrollment. The contract was made with the charterers. An action at common law would lie directly against them upon the contract. They were alone interested in the profits of the voyage, had the control of the vessel, and could make contracts for running her. It is true, liens may attach, for certain purposes, under the general maritime law, notwithstanding the charter party, and the vessel will be held thereby against the general and special owners, or she may be hypothecated, in specified emergencies, either by the master or by the charterers; but the special owners or charterers will be none the less liable, in the first instance, on all contracts made by them, or made on their account, for running her on the prescribed voyage. They had the sole right to appoint the master, determine the voyage, order the stores, select the crew and receive the freight money. No one would, if applied to by them for supplies, wait for the assent of the general owners, or think he was dealing with the latter. If they were known to him, and were of undoubted responsibility, he would deal with them without looking further; and if they were insolvent, or in doubtful circumstances, he would refuse to supply the stores ordered by them. He would treat them in all respects, pro hac vice, as the only owners with whom he had to deal. They would be liable to him on their contract; and at common law he would proceed directly against them. They are the immediate parties to the contract—not the general owners. Hence it has been frequently decided, both by common law and admiralty courts, that supplies for a ship are furnished on the credit of the master and owner when ordered by the master, but when the ship is out of the employment, or entirely beyond the control and management of the general owner, the charterer, whether under a parol or written contract, is held therefor, and not the general owner. Frazer v. Marsh, 13 East, 238; Reeve v. Davis, 1 Adol. & E. 312; Cutler v. Thurlo, 20 Me. 217; Thompson v. Hamilton, 12 Pick. 428; Muldon v. Whitlock, 1 Cow. 290; Manter v. Holmes, 10 Metc. [Mass.] 402; The Monsoon [Case No. 9,716]; The Nathaniel Hooper [Id. 10,032]; Skolfield v. Potter [Id. 12,925]; The Volunteer [Id. 16,991]; Gracie v. Palmer, 8 Wheat. [21 U. S.] 632; Philips v. Ledley [Case No. 11,096]; Fisher v. Willing, 8 Serg. & R. 118; Certain Logs of Mahogany [Case No. 2,559].

If, then, the charterer is primarily liable, and the general owner is no party to the contract—if the former is owner for the voyage, why should not his residence be her home port for the voyage? Weaver v. The S. G. Owens [Case No. 17,310]; Drinkwater v. The Spartan [Id. 4,085]; The Phebe [Id. 11,064]. As under the navigation acts and ordinances of most nations, the general owners and charterers must necessarily be of the same country, this question would not be likely to arise in those countries; and we are not aware that it has ever been expressly adjudicated, except by the district court, in this case. It must therefore be considered in the light of established principles, and by rules fairly deducible therefrom. The point is not, whether an existing maritime lien binds the vessel as against the owners, when the contract is made by the charterer, or whether supplies furnished a vessel, when out of the employment of the general owner and in a foreign port, give a maritime lien; but whether the port where the supplies are furnished is, pro hac vice, a foreign port, so that a maritime lien exists therefor, at all, as against either the charterer or the general owner. To determine whether a maritime lien exists at all, in this case, the residence of the owners must be ascertained; that is, the residence of the owners for the time being. If the dealings and personal credit, primarily, would be with the special owner, then his residence ought to be considered the home port, within the spirit of the maritime rule; or otherwise, the reasons on which that rule is founded, would cease altogether, viz: that a lien is given because there is a necessity for relying upon the credit of the vessel itself, the solvency or responsibility of the contracting party being unknown, and his residence being beyond the territorial jurisdiction of the courts of the country where the supplies are furnished. And further, as the charterer, and not the general owner, is personally responsible for the supplies, it is his solvency and residence that are alone to be regarded. It is therefore considered by this court, that the decision of the district court on this point is correct; that under a full charter-party, the residence of the charterers, quoad all contracts for supplies of the kind named, during its continuance, is the home port of the vessel. The libellants had, therefore, no maritime lien when their libel was filed in this case. The Missouri statute had given them a local lien, which, still existing, would be enforced in admiralty; but that lien was extinguished by the proceedings, under that statute, in the court of common pleas. They did not prosecute their claim before that court, according to the statute, against the funds arising from the judicial sale of the vessel; and, by the terms of the Missouri act, said sale divested all local liens created by the act; and the purchaser (who is the claimant here) took the vessel, discharged of all Missouri liens. "When any boat or vessel shall be sold, under the eleventh section of this act, the officer making the sale shall execute to the purchaser a bill of sale therefor, and such boat or vessel shall, in the hands of the purchaser and his assigns, be free from and discharged from all previous liens and claims under this act." Section 13 of the Missouri "Act concerning boats and vessels," approved March 26, 1845 [Dig. Laws Mo. 1845, p. 180]. In the case of

the Ambassador, the owner resided in Newport, Kentucky, opposite Cincinnati, Ohio, where the boat was enrolled. He was an officer on the boat, and transacted the business of the boat in Cincinnati. Cincinnati was the port nearest his residence—the place where he was to be found for business purposes. Newport is substantially suburban, for business transactions, to Cincinnati; and although in different states, separated from each other by the Ohio river, they are so intimately connected in maritime or commercial matters, as to constitute one port within the maritime rule governing the character of a vessel. The solvency of the owner may be presumed to be as well known at his place of business as on the other side of the ferry, and he was constantly, or almost daily, within the territorial jurisdiction of the Ohio courts. The general rule, that the ports of one state are foreign to the ports of all other states, must not be held to mean that a port on one side of a river which is the dividing line of two states, is necessarily limited in its extent, and for all purposes, to the side of the river where the main business of the port is done; for it frequently happens, that the port nearest to the owner is in another state; and by the collection and enrollment laws of the United States, the business of the boat, under those laws, must be transacted at the custom house of said nearest port; that, for all port purposes, under the United States statutes, said nearest port 'ncludes the residence of the owner; that the place of the owner's residence and of his business are substantially the same, and are included within the true meaning of the port where the enrollment is made. In this case, the evidence would justify the conclusion, perhaps, that the residence of the owner was upon the boat; but assuming the facts to be, that Cincinnati was his place of business, and that his residence was on the opposite side of the ferry, inasmuch as the enrollment was at Cincinnati, and the business, both of the boat of her owners, was done in that city, and as Newport is substantially a suburb of Cincinnati, the home port of the vessel is held to be Cincinnati. The lien, therefore, of these libellants, if they have any, must be by force of the laws of Ohio. By those laws it was essential to a lien, that a libellant's demand should be sworn to and recorded, within four months from the time it accrued. Swan's Rev. St. Ohio, p. 551 et seq. No sworn account was filed by them for record, as required, and they have no lien, therefore. under the Ohio law.

The argument, that as the work done on this vessel added to her value, and thereby benefited both the owner and mortgagee, and that, as the work might have been made a lien on the vessel, the case should be considered as falling within the rule, that courts of admiralty will take cognizance of demands which, in their inception, were liens, is evidently misapplied here.

Admiralty courts have no general chancery powers. Dean v. Bates [Case No. 3,-704]; Kellum v. Emerson [Id. 7,669]; [The Orleans v. Phoebus] 11 Pet. [36 U. S.] 175; [Andrews v. Wall] 3 How. [44 U. S.] 568; Remnants in Court [Case No. 11,697]; 3 Hagg. Adm. 129; 1 Ves. Sr. 154. They will not notice the claims of general creditors of the owners, or parties in interest. The Flora, 1 Hagg. Adm. 303. The work in question was not done at the instance of the mortgagee, nor was there, at any time, a lien therefor upon the boat. The mortgagee, out of possession, would not have been personally liable for those repairs, even if made in a foreign port. They were not ordered by him, and they were not necessary for the preservation of his security. McIntyre v. Scott, 8 Johns. 159; Phillips v. Ledley [Case No. 11,096]; Brooks v. Bondsey, 17 Pick. 441; Lord v. Ferguson, 9 N. H. 380; Birkbeck v. Tucker, 2 Hall, 121.

The propositions already cited are conclusive against the libellants in each of these cases, without considering the more important question presented both to this court and to the district court, and ably discussed by the learned judge of the latter court in his published opinion. But as there are other cases awaiting the decision of that question, and which stand upon an agreement to abide the decision of these cases upon the effect of judicial proceedings and sales of vessels by the state courts under state laws, it is proper for us to consider that subject at this time. To understand properly the Missouri decisions cited in argument, reference must be had to the different Missouri statutes under which these decisions were made. The act of 1835 declares that "every boat or vessel used in navigating the waters of this state shall be liable first for all debts contracted," &c., and that "any person having a demand as aforesaid, instead of proceeding for the recovery thereof against the master, owner, agent or consignee of a boat or vessel, may, at his option, institute suit against such boat or vessel, by name." That act made no provisions for settling or marshalling the various demands recognized, nor directing any other than the usual course of proceedings upon common law judgments. except that the final process was an order of the court for the sale of the boat or vessel for the judgment and costs. It required that order to be executed and returned by the sheriff, in the same manner as executions. When a suit was instituted under the act, a warrant for the arrest of the boat or vessel issued, in the first instance, and the sheriff detained the boat or vessel until the final order of the court, unless she was previously discharged by giving the bond prescribed therefor by statute. In the case of Dobyns v. Sheriff of St. Louis, 5 Mo. 256, it was held that the act of 1835 [St. Mo. p. 102] gave no lien upon the boat. A suit had been commenced by attachment on

according to the lex loci is a lien, and so with lien creditors in other states, how can the proceedings in the Missouri courts under the Missouri act be considered proceedings strictly in rem, or as having the force of admiralty sales, within the admiralty principles recognized and defined in the case of The Sea Bird? A Louisiana creditor is not permitted to intervene, if he desires to do so, nor any creditor, except those presenting Missouri contracts. A proceeding in rem is "for the benefit of all interested"—all may come and establish their claim to a distributive share of the common fund—and, therefore, "it is entirely consistent with the most rigid justice," and "all the world is bound by it." If those in interest do not choose to intervene for their share of the proceeds, their refusal or neglect should not affect the title of the purchaser who has given full value for the vessel. But it is equally important that the court which exercises such powers, should have the requisite jurisdiction—that it should not be a local court, restricted in its action by local statutes, and governed by rules utterly subversive of the well-settled maxims of maritime jurisprudence. It should not be compelled to ignore the rights of all persons, save those of its own locality, and to give to home creditors exclusive privileges—denying the liens which have grown up elsewhere than within the territorial limits of the state —if it undertakes to enforce maritime liens, and to be governed by admiralty principles. The demands of foreign material men and creditors are liens by the maritime law, within the rule of necessity, but not the claims of domestic creditors. The General Smith, 4 Wheat. [17 U. S.] 443; [The Orleans v. Phoebus] 11 Pet. [36 U. S.] 175; Pratt v. Reed, 19 How. [60 U. S.] 359. By the decisions of the supreme court of Missouri upon the boat statute, demands in the home port are enforced to the exclusion of all foreign demands; thus reversing the maritime rule as laid down by the United States supreme court, or going even beyond a mere reversal; for in the admiralty courts of this country, local liens are recognized and enforced. If the doctrine of the Missouri cases obtains in state courts, the necessary consequence must be, that each state will disregard the rights of the citizens of all other states, and the adjudications of other state tribunals, and a perpetual conflict will exist concerning boats and vessels employed in the coasting trade, or upon our large Western rivers. Each state will enforce, through its own tribunals, its own local liens in favor of its own citizens, and will disregard the liens and rights of the citizens of all other states. If the judicial sale under the order of a state court, divests all liens, whether given by the general maritime law, or by common law, or by local statutes, and foreign creditors are prohibited from intervening; then the same difficulties, conflicts and injuries to commerce will be reproduced, which the grant of exclusive ju-

risdiction to the federal courts was expressly designed to prevent. Const. U. S. art. 3, § 2.

But the Missouri decisions, fairly construed, perhaps, do not cover "maritime liens." They interpret the Missouri statute, and declare the effect of a judicial sale under it, and also give the same effect to other state statutes of a similar character. Although they look to the proceedings and principles of general maritime jurisprudence for analogies to guide in the interpretation and administration of the local law concerning vessels, and hold that local liens are divided by judicial proceedings under the local statutes; they cannot be considered as maintaining the doctrine that their decisions have the force and effect of admiralty decrees. Indeed, the opinion in The Sea Bird case clearly recognizes the distinction. The Missouri boat act, and the similar statutes of other states, are not designed to confer upon the respective state courts jurisdiction in admiralty, nor to make the proceedings under them proceedings properly in rem. They are not proceedings in rem, any more than the local proceedings in suits by attachment; although they make provisions for the rights of other creditors, besides the one who institutes the suit and causes the seizure of the vessel. Strictly considered, there are no suits in rem, except admiralty suits, and no courts have admiralty jurisdiction, or jurisdiction strictly in rem, except federal courts.

If the Missouri statute is to be construed as designed to cut off all maritime liens, or even those it expressly recognizes, it would certainly be inoperative to do so. But as it has been held to be exclusively "intra-territorial" in its operation, it is evidently intended to give a lien to material men and others at the home port, and to provide a speedier and more efficacious remedy for home creditors. Many of the creditors embraced within its terms have liens by the general maritime law, independent of the statute, which could be enforced in admiralty courts. They are also permitted to prosecute their demands, and to intervene, in the state courts; and to that extent, have an additional remedy. That cumulative or statutory remedy is limited, however, by the terms of the act of 1845, to six months for material men, and to three months for seamen; the latter class of creditors being permitted to sue for only two months' wages, and required to bring suit within thirty days after the termination of the contract. Their common law remedy, it is presumed, still remains. The domestic creditor of a home vessel cannot, under that statute, proceed directly against the boat after the expiration of six months, nor does his lien continue for a longer period; yet his cause of action, in the ordinary form, still remains unimpaired against the owners and parties to the contract. His statutory right to proceed under that act, and the lien given by it, are further limited by the proceedings and judicial sale authorized

by its terms. After a judicial sale by order of the state court under the provisions of that statute, all prior liens created by the act itself, together with local liens, and all right to proceed against the boat directly for prior demands in the local court are divested. The remedy thus given does not oust the federal courts of their exclusive jurisdiction, nor necessarily interfere therewith. The state proceedings are not strictly or properly proceedings in admiralty, or in rem, although the state courts refer to the latter for analogies to guide them, and for principles to determine the rights of the parties and the interpretation and obligation of the contracts made for the boat. As Missouri creditors having maritime liens, are permitted to use that statutory remedy, the nature of their demands must be ascertained by the rules of maritime jurisprudence. In a suit by foreign attachment, or by the attachment act of Missouri, the property of the debtor is seized in the first instance, and the levy fixes a lien; yet a sale of the property, either pendente lite or after final judgment, passes to the purchaser only the title of the defendant, subject to all prior incumbrances. The incumbrancer may, in certain cases, intervene for the protection of his rights; but the proceedings in the attachment suit are not properly in rem, although inaccurately so called—the purchaser acquires no greater rights to or in the property than the attachment debtor had at the time. So under the Missouri boat act, the judicial sale passes to the purchaser only the title of the owners, divested of all common law and statutory liens of Missouri, but subject to all liens existing by maritime law and fixed by the laws of other states. Missouri has an undoubted right to determine what liens, other than maritime, shall or shall not be recognized with reference to chattels or chattel-interests within her territorial jurisdiction, and what demands shall be made to operate as a lien upon such property; but she cannot legislate so as to oust or impair the exclusive federal jurisdiction in admiralty, or to divest rights vested under that jurisdiction. She cannot legislate for states beyond her territorial jurisdiction, nor for chattels or other property beyond her limits.

Illinois, Kentucky, Louisiana, and every other state, have the same powers as Missouri, and are under no greater or less federal restrictions, and may also enact laws to operate upon all chattels and real estate within their jurisdictions respectively. No one state can legislate for another, or determine what property laws shall be operative in other states. Hence the courts of each state are governed by its legislation, both in determining the effect of transactions or agreements within the state, and in enforcing its statutes. They proceed according to the local laws, in such cases, and may or may not, as the local system or policy directs, permit, by comity, the local laws of other states to be enforced through their agency. If any citizen of Missouri has a maritime lien, enforceable in the federal courts, and the state enacts that, in addition to the federal and to the former common law remedy, the demand may be recovered in a more expeditious mode provided therefor by statute, there is no necessary conflict or interference with federal jurisdiction in admiralty, whether the additional mode of proceeding be under boat acts, or attachment laws, or through summary and amended forms of proceeding by execution under judgments in assumpsit, or debt or covenant. The additional facility is not a negation of admiralty jurisdiction, nor an infringement upon it. The purchaser under such judicial proceedings, knows that he takes cum onere, and no one is injured. He can acquire no better title than the defendant had and the state can give. The state has made liens, and provided for their extinguishment, with a due regard for the rights of all under the statute. The power to create has been exercised, also the power to limit. It has acted therein within the clear range of its powers over the subject matter, and it cannot act beyond. If any one of its citizens, having a maritime lien, elects to recover his demand through the peculiar statutory proceeding, there is no more valid reason for holding that he should not be permitted to do so, or that the whole proceeding is void for want of jurisdiction as being within the exclusive cognizance of the admiralty courts, than there would be for pronouncing the concurrent remedy at common law, by assumpsit, replevin or detinue, or by attachment process, as not within the saving clause of the ninth section of the judiciary act. 1 Stat. 73. The moment the demand is satisfied, either on execution or by voluntary payment, the lien is at an end, however created. Hence, if a libellant has a demand against a Missouri boat, which is not a maritime lien, but merely a lien created by the Missouri statute, he cannot enforce the same in an admiralty court against the boat in the hands of a purchaser under a judicial sale ordered by a Missouri court, according to the boat act of 1845, if his demand accrued prior to said sale. If he had a maritime lien, cognizable by the state court, he might proceed in that court or in the admiralty court, at his option. If he did not appear in the state court and procure satisfaction of his demand, the proceedings there constitute no bar to his recovery here, nor does the judicial sale by the order of the state court divest his lien upon the vessel. He had an undoubted right to pursue his clear remedy in admiralty, or his other and concurrent remedy at common law, or in the state courts. The federal courts having exclusive jurisdiction in "all cases of admiralty and maritime jurisdiction," can alone pass, by a judicial sale in admiralty, a title

to a vessel free from all liens. Courts of common law cannot proceed in rem, but have concurrent jurisdiction by common law proceedings. Brevoor v. The Fair American [Case No. 1,847]; Mankin v. Chandler [Id. 9,030]; O'Callaghan v. Riggs [Id. 10,400]; The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 458; Waring v. Clarke, 5 How. [46 U. S.] 441; [New Jersey Steam Nav. Co. v. Merchants' Bank] 6 How. [47 U. S.] 344; [Cutler v. Rae] 7 How. [48 U. S.] 729; 1 Kent, Comm. 377; De Lovio v. Boit [Case No. 3,776]; The Wave [Id. 17,300]; Davis v. New Brig [Id. 3,643]; Hallett v. Novion, 14 Johns. 273; Percival v. Hickey, 18 Johns. 257.

The difficulties urged upon our attention with respect to local liens and the proceedings in state courts to enforce them, and the embarrassments arising therefrom under the decisions in admiralty, present very grave questions; and were these decisions now open for review here, it might be important to consider the whole subject, so as to arrive at some result which would obviate, as far as possible, the real or apparent conflict. The boat act of Missouri and the proceedings under it are, by virtue of the undoubted authority of the state to legislate with regard to common law rights and interests in chattels, within her territorial jurisdiction. It may be a difficult task to reconcile the recognition of a lien, not maritime, as enforceable in admiralty against the vessel itself, with the exclusive jurisdiction of admiralty courts—that is, that they may proceed, in the first instance, to enforce a mere local lien, by adjudicating the demand and decreeing the condemnation and sale of the vessel, so that said sale shall pass a title free from all liens and incumbrances whatsoever; and thus draw within their jurisdiction the adjudication of all common law demands for which a local lien may be given by any state, and impart to those liens such force and effect as belong solely to maritime liens. If the local law can create a lien, and provide the mode of enforcing and divesting it, why should not all proceedings by virtue of that local act be confined to the local tribunals? The power to create the lien results from the power to prescribe rules for the transfer, mortgage, &c., of chattels—a power equal, in all respects, to that over real estate within the same territorial limits. Treating a vessel as the common law treats it—merely as a chattel—and then considering its migratory character, and that its owners are often non-residents, the state of Missouri has deemed it expedient to fasten liens upon it, in favor of its own citizens, who furnish money, repairs, &c., to enable the vessel to prosecute her voyages. In so doing, it acts upon the vessel only from the common law point of view, as an ordinary chattel. It has no power to treat it as the admiralty courts do, or to divest maritime liens. It can divest the liens of its own creation, and none other. Its courts

act just as courts of equity do with partnership assets in the hands of a receiver, or in marshalling equities under a creditor's bill to funds in court; where the purchaser of the property, sold under the order or decree, takes no better title than the respondents could give. The boat act of 1845 provides for marshalling its local liens and the enumerated maritime liens, and requires those holding the local and other liens to come in and share, according to their recognized rights, the fund in court arising from the sale cum onere. The local liens are divested, and those having them are required to pursue the fund in court, or be remitted to their common law actions against the parties. Those having liens under the maritime law, of the description named in the act, may also pursue their demand against the fund, and take their distributive share, according to the rules there prescribed; or they may elect to follow their remedies at common law or in admiralty. To the extent that they receive satisfaction of their demands under the statutory proceeding, their liens in admiralty, and their rights at common law, are extinguished; but no further. Because they are permitted to prosecute their demands in the state courts, they are not precluded from enforcing them also in admiralty, or from instituting the ordinary actions therefor at common law. But if the Missouri citizen, who holds a maritime lien which falls within the terms of that act, does not choose to pursue it in the state court, his lien is not diverted by the sale, notwithstanding the thirteenth section, which declares that "such boat or vessel shall, in the hands of the purchaser and his assigns, be free and discharged from all previous liens and claims under this act."

The language of the statute is precise, and presents no conflict; for the liens under the maritime law are not properly liens "under," or created by, that act. But how is it with a creditor having a maritime lien, who proceeds in accordance with that act, being the only party who obtains judgment under which a sale is ordered, when the fund arising from the sale is not sufficient to satisfy his demand? Shall he subsequently pursue the vessel, for the unsatisfied portion of his demand, in admiralty, and procure a condemnation and a new sale against the purchaser at the former sale? Or, if the funds derived from the former sale are sufficient to satisfy his demand, and, under the subsequent proceedings in the state court, the same is distributed among those having priority by the statute or mere local liens, is his demand to be considered as satisfied or unsatisfied in admiralty, and the boat again seized in the hands of the purchaser, for the same demand upon a judgment for which the former sale was ordered? The priorities named in the Missouri act, are not those recognized in admiralty; and, no doubt, it frequently happens, that those who

have merely local liens exhaust the fund, when maritime liens are actually before the court. So the creditor having a local lien, may proceed by the ordinary actions at common law, or as prescribed by the boat act, or in admiralty; and is he to be held concluded by his election, or permitted, after having proceeded in the state court to judgment, to libel the vessel in admiralty, for the original demand not satisfied out of the proceeds of a sale thereunder? Is the demand merged in the judgment? We are aware that there are many questions of this character, which may hereafter arise for adjudication. Many of the difficulties spring from the different manner in which a vessel is regarded at common law and in admiralty. By the former, a judicial sale passes only the interests of the defendants, if under a fi. fa., upon a judgment against them. If they had previously incumbered the chattel by mortgages, or any of the modes of hypothecation known to the common or local law, the chattel would still be subject to all of those outstanding interests, after sale on execution, just the same as would the defendants' realty, under similar circumstances. But, as a peculiar class of liens is created by the statute, and others may exist at common law by the acts of the parties, the whole of those liens and incumbrances the general assembly of Missouri has deemed it wise to marshal, according to rules enacted therefor, whenever the chattel has to be sold, under judicial process, against the boat. In order, also, to prevent multiplicity of suits, and various outstanding interests in a chattel, and a sacrifice of the vessel, and protracted litigation concerning the respective rights of the many interests in the property sold, the statute provides that, when a sale takes place under its provisions, not only shall the interest of the owners pass to the purchaser, but also the interests of all others having statutory or common law liens or incumbrances, leaving all who have maritime liens, (save a few,) wholly untouched, and granting to the excepted few permission to come in and share the proceeds. If the statutory liens, like common law incumbrances, were left to be enforced solely by the local or common law courts, or were cognizable in admiralty, like mortgages, only as against remnants and surplus, some of the embarrassments suggested might be obviated. Now, by adjudications, and by the rule adopted by the supreme court of the United States, any one having merely a local lien may libel a vessel, and proceed in rem in admiralty, upon that local lien, to condemnation and sale. The General Smith, 4 Wheat. [17 U. S.] 443; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 390; Read v. Hull of New Brig [Case No. 11,609]; [The Orleans v. Phoebus] 11 Pet. [36 U. S.] 175, rule 12. The local law, without which the federal court would not, and could not act

in admiralty upon the specified demand, is made to give a new sweep to federal jurisdiction, drawing within the vortex of admiralty the adjudication of common law and local demands, to be governed by other than the common law and statutory modes of proceeding. Instead of federal courts having exclusive jurisdiction in admiralty, and stopping where maritime demands and rights in admiralty stop, they take jurisdiction of local liens, and (by virtue of local enactments) not of maritime subjects merely, which are governed by rules of universal application, but of the various conflicting statutory and other regulations of the states; and then do not follow and enforce those state laws, but modify some of the provisions, disregard others, and balance the clashing rules of the local system of one state against those of another; until what was designed for a court of admiralty, whose decrees should be based upon maxims of universal recognition, and common to all civilized maritime countries, becomes a strange anomaly, exercising jurisdiction as varied as admiralty, common law and state legislation, and as irreconcilable as the many differing statutes of the various states at whose ports a vessel may touch, in the course of her many voyages. Admiralty courts cease thereby to derive their jurisdiction solely from the federal constitution and laws, and to be guided by admiralty rules, but virtually assume and exercise jurisdiction, as the same may be enlarged or diminished by mere state legislation, without the possibility of uniform proceedings with respect to the whole Union or harmony of federal action. Each case dependent on a local lien, has a law for itself. The furnishing supplies to a vessel touching at one port, will give a lien to be enforced in admiralty by United States courts, when precisely similar contracts, made under like circumstances in all respects at another port, will carry no right to cognizance by those courts.

Such considerations as these might have been urged with great force and propriety, if the questions they present were open for review or adjudication in this court. The conflicts and difficulties that frequently arise from different systems of jurisprudence, and from different principles belonging to even the same system, and often involved in the same facts submitted for adjudication, are incidental to all judicial proceedings. No argument therefrom will justify this court in departing from the rules formally settled by the United States supreme court. It is too late to question in this court, at this time, the existence of the rule which confines maritime liens to foreign vessels, or that recognizes in admiralty local and common law liens, or that holds the ports of different states foreign to each other. The General Smith, 4 Wheat. [17 U. S.] 438; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U.

S.] 390; [The Orleans v. Phoebus] 11 Pet. [36 U. S.] 175; Thomas v. Osborn, 19 Pet. [60 U. S.] 22. Whether a fuller consideration of the whole subject, and a more systematic adjustment of these questions, would produce a change of some of the existing rules, it is not for this court to determine.

After a long controversy, it has been settled that the grant in the constitution is neither limited to, nor to be interpreted by, what were cases of admiralty jurisdiction in England when, the United States constitution was adopted; that admiralty jurisdiction is not taken away in cases where courts of common law may have concurrent jurisdiction; that exclusive admiralty jurisdiction is conferred on the United States courts; that it is not limited to tide waters, but extends to all public navigable lakes and rivers where commerce is carried on between different states or with a foreign nation; that it does not exist for the enforcement of the rights of mortgagees; that, in cases of collision, rules of navigation prescribed by the laws of a state, though binding upon the courts of that state, cannot regulate the decisions of the federal courts administering the general admiralty law; when repairs or supplies are procured by the master in a foreign port, in a case of necessity, and the credit has necessarily to be given to the vessel, or it is necessary to rely on the credit of the vessel, a maritime lien therefor exists; a mortgagee may be a claimant, or intervene for proceeds of a sale, but cannot libel the vessel for the mortgage debt; that no maritime lien exists for supplies furnished in a home port, but if given by the municipal law, they will be taken cognizance of and enforced in admiralty, and a libel may be filed therefor, and proceedings maintained against the ship and freight in rem, or against the master or the owner alone in personam. Waring v. Clark, 5 How. [46 U. S.] 441; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344; The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443; Fretz v. Ball, Id. 466; The New World v. King, 16 How. [57 U. S.] 469; Bogart v. The John Jay, 17 How. [58 U. S.] 399; The New York v. Rea, 18 How. [59 U. S.] 225; Thomas v. Osborn, 19 How. [60 U. S.] 22; Pratt v. Reed, Id. 359; Tod v. The Sultana, Id. 362; The General Smith, 4 Wheat. [17 U. S.] 443; Peyroux v. Howard, 7 Pet. [32 U. S.] 324; Rule 12 Sup. Ct. Adm.

The jurisdiction of the United States courts is, therefore, not restricted by the narrow rules existing in England at the adoption of the United States constitution. Those restrictions resulted from the conflict there between the admiralty and common law courts, which ousted the admiralty courts of jurisdiction over maritime contracts in home ports. The doctrine of the United States supreme court follows the English rule, however, so far as to deny that a maritime lien exists for supplies or repairs furnished in a home port, instead of acting upon the more extended and general rule of the civil law, which recognizes no distinction between the home and foreign port in such cases. Abb. Shipp. 142. It then recognizes and enforces municipal liens given in home ports by state statutes. Thus the one rule cuts off the domestic creditor; and the other brings him back within admiralty cognizance, it may be with rights superior to the foreign creditor, who has a maritime lien; for the supreme court has expressly withheld all expression of opinion as to the rule of necessity, with reference to municipal liens. Pratt v. Reed. 19 How. [60 U. S.] 359. When the supreme court decided in the case of The General Smith that no maritime lien exists for supplies, &c., furnished in the home port, but that municipal liens would be recognized and enforced, the various states had to adopt statutes creating such municipal liens in order to protect their own creditors, and place them on equal footing with foreign creditors. If the civil law doctrine had been adopted, instead of the English, there would have been no distinction between the home and foreign port as to the rights of material men and others, and there would probably have been no necessity for a recognition of municipal liens, except as against remnants and surplus, just as with mortgages. Municipal liens might have been treated as on the same footing with mortgages and other common law incumbrances. The adoption of the civil law rule, or that the various states of the Union are not foreign to each other within the maritime doctrine, might remedy some of the difficulties named. If no such distinction existed, between liens in home and foreign ports, there would be very little, if any necessity for the boat acts of the different states; and then a refusal to give to municipal statutory liens any better standing in admiralty than a mortgage or other common law incumbrance, would probably go far to establish uniformity in the maritime jurisprudence of the United States, and to remove the embarrassments suggested. Under the various rules now authoritatively established in this country, it frequently happens that a vessel is libelled in a home port, on a home demand, by virtue of the local lien given by statute, and condemned and sold; and that, on the final adjudication of the rights of libellants, claimants, and intervenors, not one maritime lien is presented for consideration, or really exists; yet the admiralty court has taken cognizance of and enforced only municipal liens, without having had any other jurisdiction than what sprung from local state legislation. In such instances, it is virtually turned into a tribunal to dispose of purely common law demands, arising from local legislation, which more appropriately belong to local tribunals. And whilst passing upon home demands against a domestic vessel, it often occurs that other demands are interposed, resting for their validity solely upon

the legislation of other states. The circumstances under which such liens are fixed by state legislation, and the limitations upon them, are very different. Thus, in Ohio, the demand has to be duly recorded within four months, and then the lien continues for two years. In Louisiana, in some cases recording is necessary, and in others not necessary; some demands are limited to sixty days, and others to departure on the second voyage. In Missouri no recording is required, but under the act of 1855, seamen's demands are restricted to wages for two months, and the right to pursue the boat therefor, by name, is limited to thirty days; whilst material men can enforce their demands on accounts for a year after the accruing of the last item, except that in St. Louis county, (where most of those demands arise,) the limitation of right to sue the boat is six months; thus seamen who are favored in admiralty are restricted by the local law, and different rules exist for residents of different counties, working the greatest injustice among citizens even of the same state. The different local statutes prescribe different rules of preference and of priority; and the judicial interpretation of them by the state courts of last resort is guided by analogies from different systems of jurisprudence—one local court looking to the maritime system, and another to the common law system. Here, in Missouri, the earlier adjudications upon the statute followed the common law rules, giving to a prior attachment, when levied, preference over the statutory liens; and to the statutory lien under which the vessel was first seized, preference over liens declared to be superior by the statute itself; but when a fuller boat act was adopted in 1845, the maritime law was held to be the proper source for rules of interpretation. As the decisions of the United States supreme court prior to the case of The Genesee Chief [supra] limited admiralty jurisdiction to tidal waters, the vast commerce of the Western states, inter sese, and with foreign nations, was left, so far as boats and vessels were employed within the territorial limits of the respective states, to be governed by common law rules, or such local statutes as might be, from time to time, adopted for the purpose of enforcing the rights of parties. As no state could exercise, or confer on its own courts the power to exercise admiralty jurisdiction, the various statutes and adjudications under them became more and more restricted in their beneficial operations, until they were confined to creditors resident in each state respectively. The local courts, like those of Missouri, were consequently embarrassed in deciding many cases before them; for, having no power to proceed in rem, they often felt the necessary injustice done creditors resident elsewhere, but with no authority to apply with full force the wiser maritime rules which give proper effect to the maritime demands of all persons, wherever residing. Under those local statutes conflicts of jurisdiction necessarily arose. Vessels sold under the order of a state court were not and could not be divested of maritime liens, nor of liens existing in other states; and consequently the purchasers at those judicial sales were controlled in their bids by the legal fact, that they were acquiring the property cum onere, —subject to all tacit and other liens which might exist against it at each port in every other state where the vessel had touched, it might be, during her lifetime. The decision in The Genesee Chief opened the door to the navigating interests of the West, for relief from a large portion of the burthens under which they had suffered. Still the early rule established in the case of The General Smith is in full force; and the necessity for local statutes to protect home creditors is not removed. Those statutes still remain.

Under the concurrent jurisdiction at common law, a vessel may be seized and sold to satisfy a judgment rendered against the owner, or the proceeds may be distributed according to the statutory rules governing the local courts; or it may be brought within the cognizance of said courts on their equity side; yet, according to the well settled doctrines on both sides of those courts, the judgments and decrees bind only the parties thereto and their privies, and the vessel being made "to plough the seas, and not rot by the wall," is soon beyond the territorial jurisdiction of those tribunals and subject to demands not cut off or concluded by the judgments or decrees thus rendered. From the very nature of the case, owners, mortgagees, lien creditors, and others having an interest in the thing sold, could not be personally served with a summons or subpoena within the state, because they were residents of the various Western states at whose ports the vessel had touched, and beyond the territorial jurisdiction of any one local tribunal. In admiralty courts alone, the power existed to make all the world parties to the proceedings. Similar embarrassments may arise in common law suits and in equity proceedings, it is true, with respect to other chattels; yet many of those conflicts have been settled by a long series of adjudications. It is impossible to adjudicate, in one suit, all points that may arise from the concurrent jurisdiction of admiralty and common law tribunals; nor would any court be guilty of an attempt to do so. In the cases now before this court for adjudication. and intended to be covered by this decision, some of these difficulties have arisen; and it has been thought proper therefore to present more at length than is usual, the source of the conflicts, the nature of the questions involved, and the principles by which they are governed. This has been done the more cheerfully, because the growing litigation in Western admiralty courts requires that the doctrines involved, and the nature of the system, should be understood at an early day. This department of jurisprudence has not received so large a share of professional attention in the interior states as in

those having tidal waters; because, until the decision of the United States supreme court in 1851, it was held that the general admiralty and maritime jurisdiction of United States courts did not extend above tide water on the Mississippi river. A careful examination of the maritime codes as interpreted by admiralty courts, will also indicate the necessity, in some cases, of a very different application of their established principles to river navigation in the West. Rules that grew up under ocean navigation and concerning sea voyages, may sometimes be found inapplicable with technical rigor to voyages along the navigable rivers of the Mississippi valley. With the increase of Western population and productions, a corresponding increase of Western commerce must occur. Hence the magnitude of the interests and of suits concerning river navigation, will continue to add to the practical importance of the various questions decided in the admiralty courts. Unfortunately, only a few, comparatively, of the many cases hitherto have involved sums · large enough to authorize an appeal to the United States supreme court; and hence the various district and circuit courts are without the advantages which decisions by the court of last resort would afford. The decisions of the various district and circuit courts are, with few exceptions, unknown, and inaccessible to the profession generally, and to other courts. With a full appreciation, therefore, of the arguments of the able advocates in the cases under consideration, and of the necessity of educing from general ·principles of the maritime law some of the rules applicable to the facts, and with due regard at the same time to the decisions obligatory here as settled by the United States supreme court, this opinion has been more extended in its consideration of the views urged upon our attention than under other circumstances would have been deemed necessary. The conclusions at which this court has arrived, may be briefly stated, as follows: There can be no lien by the general maritime law for materials and supplies furnished a vessel in her home port. Whether a vessel is foreign or domestic must be determined by the residence of her owners, and her enrollment is only prima facie evidence of their residence. If a vessel is navigated by charterers, and by the terms of the charter party they have exclusive control of· her,—directing her voyages, receiving the freight money, manning and victualling her, &c.,—then they are to be deemed, pro hac vice, the owners for the purpose of ascertaining the home port where she is libelled for supplies furnished to run her. The jurisdiction of the United States courts in all civil cases in admiralty is exclusive of the several 'state. courts; and the latter have the jurisdiction of only the appropriate common law remedies. A lien given by the general maritime law cannot be divested by the legislature of a state. The boat act of Missouri cannot, and does not, deprive a person who has a lien un-der the general maritme law, of the right to enforce that lien in the United States courts. The acts of the various states creating municipal liens,—providing, as many of them do, for their enforcement in suits instituted against the vessels, by name, instead of against the owners, prescribing, too, the modes of ·proceeding therein and of divesting those municipal liens, declaring the rules of priority among domestic creditors, ordering the sale of the vessel and the appearance of the specified lien creditors to urge their demands against the proceeds when brought into · the state courts, do not make those proceedings properly suits in rem or give to those courts admiralty powers or jurisdiction. Hence, the judicial sales made under such acts by the order of state courts, divest only the liens created by· those acts and the municipal liens embraced within their terms. The purchaser in such cases takes, cum onere as to existing ·maritime liens, and as to the municipal liens of other states. A decree and sale in admiralty alone can pass, judicially, a title to a vessel, discharged of all liens and incumbrances whatsoever. Where the place of an owner's residence is substantially suburban to, or a part of the port where a vessel is enrolled, and he does his business or the business of · the vessel at the port of enrollment, then the port of enrollment is to be deemed the home port of the vessel, although the residence of her owner is technically on the other side of a river separating two states and the two parts of the same port. For the purpose of determining whether Cincinnati was the home port of the Ambassador at the time the demand accrued, it is sufficient that she was enrolled there, and that her owner, although residing on the other side of the ferry, in Newport, Kentucky, did his business and the business of the vessel in Cincinnati. As the libellants' account was not sworn to and recorded, as prescribed by the Ohio statute, it is not a municipal lien under the laws of that state. Courts of admiralty have no general equity powers, and will not take cognizance of undefined equities, or of the rights of general creditors. The distinction between demands accruing for materials and supplies furnished in a home port. and when furnished in a foreign port; the rule that the ports of the different states are foreign to each other, within the operation of the maritime law; and the jurisdiction of admiralty courts. in cases founded solely upon municipal liens; and the power of such courts to pass upon the claim of a mortgagee, and order the proceeds of a sale in admiralty to be paid over to him, although he is not permitted to libel the boat for the payment of the mortgage money—these rules are not open for review in a United States district or circuit court, nor will those courts go behind the decisions and ·rules of the United States supreme court, because difficulties and embarrassments may arise from their application. The Missouri boat act provides for only a le-

gitimate exercise by its courts of their concurrent jurisdiction at common law over demands accruing in the navigation of boats and vessels. The fact that, in addition to the ordinary forms of suits at common law, Missouri has adopted a form of proceeding whereby a warrant is issued against the boat, in the first instance, and a suit is maintained against her by name, and also providing that Missouri creditors, who have a general maritime lien, may prosecute their demands under that act, does not interfere with the exclusive jurisdiction of the United States courts in admiralty, so as to render said act unconstitutional. An additional remedy at common law does not oust admiralty courts of their exclusive jurisdiction in admiralty. Whether the adoption of the rule of the civil law, with respect to supplies, &c., in the home port, or of any other rule different from what the United States supreme court has laid down, would be more consistent with the general maritime law, produce less conflict or difficulty, secure more uniformity, and enforce more wisely the just rights of parties, is a fit subject for the consideration of that court; but so long as those rules are adhered to by that tribunal, inferior courts must apply and enforce them. Municipal liens, within the terms of the Missouri statute, are divested by a judicial sale under that statute, and cannot thereafter be pursued in admiralty. As some of the points considered in this opinion were, as before stated, elaborately discussed by the learned judge of the district court, from whose decisions appeals were taken, and as he reviewed with great care and accuracy most of the United States statutes, and of the adjudicated cases bearing upon the questions involved, —Hill v. The Golden Gate [Case No. 6,492], and Ashbrook v. The Golden Gate [Id. 574],— and as this court fully concurs with him in his views as thus expressed, it has been deemed proper to avoid a repetition of the arguments and authorities cited by him, as far as practicable, and merely to present some additional suggestions corroborative of his conclusions. The decrees in each of the cases before this court are, therefore, in all respects, affirmed, with costs.