## STEAMBOAT BELFAST *vs.* BOON & CO.

[LIBEL IN ADMIRALTY AGAINST STEAMBOAT.]

1. *Constitutionality of State law, authorizing proceeding in admiralty against steamboat.*—Neither the constitutional grant to the United States of judicial power in "all cases of admiralty and maritime jurisdiction," (art. III, § 2,) nor any of the acts of congress which have been passed to carry that grant into effect, takes away from the several States the right to create or declare a statutory lien in favor of a shipper, for the loss of his goods, on a vessel navigating an interior river above tide-water, and to authorize the enforcement of that lien in a State court, by a proceeding in the nature of a libel in admiralty ; the suit being brought in the State in which the contract of affreight

Steamboat Belfast v. Boon & Co.

ment was made, and in which are situated both the place at which the goods were shipped, and the place at which they were to be de livered. (A. J. WALKER, C. J., *dsssenting.*)

2. *Liability of common carrier, for loss of goods by piracy or robbery.*—At common law, piracy was a defense to a common carrier, for the loss of goods, but robbery was not; and this principle of the common law is not in any manner changed or affected by the act of congress of 1820, (1 Brightly's Digest, 203, § 35,) which declares robbery on any river where the tide ebbs and flows to be piracy.

3. *Amended answer to libel.*—When an amended answer to a libel in admiralty is repugnant to the original answer, the court may prop-erly refuse to allow it to be filed; but, after it has been filed by per mission of the court, an exception to it on account of such repugnancy comes too late.

4. *Mistake in written contract not available as defense.*—In an action on a written contract, an alleged mistake is not available as a defense the mistake must be first corrected, by an appropriate proceeding, in equity.

5. *Fraud; what constitutes.*—A misrepresentation as to a matter of law does not, ordinarily, constitute a fraud; nor does a misrepresentation as to a matter of fact, concerning which the party complaining ought to have been informed at least as well as the opposite party, and where no relation existed between them which justified him in rely-ing on the representations of the other party without inquiry.

APPEAL from the City Court of Mobile.
Tried before the Hon. H. CHAMBERLAIN.

THE appellees in this case filed a libel, on the 30th March, 1866, against the steamboat *Belfast,* to recover damages for the loss of twenty-nine bales of cotton, part of a lot of one hundred bales, which were shipped by them on said steamboat, on the 23d January, 1866, at Vienna, in Pickens county, Alabama, consigned to J. E. Curran & Co. at Mobile. Libels were also filed against said steamboat by J. H. & S. B. Steers and John Watson & Co., (the libel of the former being filed on the 29th, and that of the latter on the 30th March, 1866,) to recover damages for the loss of cotton shipped by them, on the same trip, at Columbus, Mississippi, and consigned to persons in Mobile. The sheriff having taken possession of the boat under these libels, B. C. Nelson and A. F. Hurtel intervened as owners, and filed an answer to the libel in each case; and, in the two cases of Steers and Watson, they filed a protest to the jurisdiction of the court, "because the contracts of affreight-

ment, upon which said libels are founded, were entered into in the State of Mississippi, and beyond the jurisdiction of this court." The court overruled the protest to the jurisdiction; to which ruling and decision exceptions were reserved by the libellants, Steers and Watson. The following are the material allegations of the answer to the libel of Boon & Co., the answers in the other cases being substantially the same:

"3. Respondents are informed, that said boat left Columbus, for Mobile, on the morning of the 22d of January, 1866; that said boat descended said river, until she reached a point about five miles below Coffeeville, at 'Malone's Gin,' at which time she had on board a number of passengers, and five hundred and ninety-five bales of cotton, consigned to different firms in Mobile; that near said gin-house, between nine and ten o'clock P. M., on the 25th day of January, 1866, a party of men, on the east bank of the river, hailed said boat with a light, as is usual on said river. The captain, who was at the wheel at the time, had the engine stopped, and asked what was wanted. They replied, they had freight to go on board. The captain informed them he could not take any more freight. They then informed the captain that there were passengers to go aboard. The captain informed them that he could not accommodate any more passengers. By this time, said boat was within twenty or thirty yards of the bank, when about twenty armed men cocked their guns, and levelled them at the boat, and told the captain that, if he did not land the boat, they would fire into her. Being satisfied that the threat would be carried into execution, and fearing a destruction of life and property, and hoping to save said boat and cargo, the captain landed said boat, as ordered; when a man by the name of Britton came aboard, and asked the captain if there were any Yankees aboard. The captain said that there were no Yankees aboard, that he knew of. Britton then demanded the surrender of the boat. The captain replied, that she would not be surrendered; when Britton cried out, "Boys, come aboard;" when about twenty armed men came aboard, all disguised by having their faces blacked. Britton again demanded the surrender of the

boat; the captain refused to surrender, and was then sur-rounded by said armed men, and arrested by them. The captain was then ordered by Britton to go to the wheel, but replied that he would die first. They then marched the captain to his office, made him go into the office, and locked the door, and put an armed guard over him, and took forcible possession of said cotton, boat, &c.

"4. Respondents are informed, that an armed body of men went to E. H. Gordy, the pilot, and compelled him by force to go to the wheel, and the engineers were likewise compelled to get up steam on said boat by said armed men, and said boat was started down the river; that said armed men put off cotton at different places on the river, as the boat went down; that said boat was taken into 'the cut-off' by said armed men as aforesaid, on Sunday morning, the 28th day of January, 1866; that she was there tied up until near night, and then started up the river, and about 8 o'clock P. M., at the lower end of 'McIntosh's Bluff,' the boat was landed, and the captain driven ashore by said armed men; that said boat was then moved up the river a distance of about eight miles, where both the clerks were driven ashore; that said boat was then moved up the river, to a place called 'Beckham's Landing,' where another lot of cotton was put off; that said boat was then turned over and delivered to the mate and pilot, and was then rounded to, to go down the river; but, as she rounded to, she was fired into by a party on shore, several of the shot or balls passing through the pilot-house; that said boat was landed, and inquiry made as to why she was fired into; to which the parties on shore replied, that they thought the persons on said boat wanted to steal the cotton on the bank; said boat was then started down the river, took on the clerks, and then the captain, when she was put under charge of the captain, who moved the boat a short distance below to the mouth of the bayou just above the junction of the rivers, where he found the steamboat *Marengo* taking a portion of the cotton that had been put off the *Belfast;* that in a short time a gunboat of the United States came up, under charge of an officer of the United States; that said officer took charge of said steamer *Belfast*, and

ordered the captain to go up the river to 'Paine's Land-ing,' and to take on board all the cotton that could be found that had been taken from the *Belfast*; that this was done, and the said boat then proceeded to Mobile, under charge of said United States officer; that said boat reached Mobile on the morning of the 31st of January, 1866; that Captain Taylor and the officers of said boat afterwards en-tered a protest, in due form, a copy of which is hereto attached, marked 'exhibit (A),' and made a part of this answer,—the original will be produced on the trial, if re-quired; that the whole matter was investigated by the mil-itary authorities, in pursuance of an order of Major-General C. R. Wood, commanding the district of Alabama; that the officers of said boat were discharged, and those who committed the robbery kept or held for trial; that some of them have been convicted for robbing said boat, and sen-tenced, and others held under bond for trial. All the evi-dence, proceedings, &c., will be exhibited to this honorable court, if required.

"5. Respondents are informed, that said steamboat was delivered by the military authorities to Charles Briggs & Co., as the agents of the owners, on the evening of the 31st of January, 1866; that all the cotton shipped on said boat, at Columbus and intermediate landings, as aforesaid, was then, and at different times since, delivered to the different consignees thereof, except from thirty-eight to forty-three bales; that there are two other cases pending in this hon-orable court, against said boat, for cotton said to have been lost on said downward trip as aforesaid, one for the value of thirty bales, and one for the value of thirty-four bales.

"6. Respondents are informed that, on the 9th day of February, fifty-nine bales of said cotton, which had been recaptured after it had been taken from said steamer *Bel-fast*, was turned over and delivered by Charles Briggs & Co., as agents of said boat; that, owing to the fact that the marks on the cotton had been defaced, and, in some in-stances, the bagging partly cut off, it was agreed that it would be received and distributed among the consignees *pro rata;* that a copy of said receipt is hereto attached, marked 'exhibit (B),' and is made a part of this answer.

The original will be produced upon the trial, if required.

"7. Respondents are informed, that the tide ebbs and flows some distance above the point where said boat was captured as aforesaid ; that the officers and crew had no arms, but acted in good faith, and did all in their power to save said boat and cargo; that said boat and cargo was captured by a number of lawless, roving robbers, at a point on the Bigbee river where the tide ebbs and flows, and within the admiralty jurisdiction of the United States ; that by an act of the congress of the United States, said act of robbery is declared to be piracy ; and that neither the boat nor the owners are liable for the act as aforesaid, if the officers and crew acted in good faith, and did all in their power to save said boat and cargo.

"8. Respondents are informed, that it is the universal practice and understanding among steamboat-men navigating the waters of the Bigbee river, that when cotton is received by a boat, to be transported to Mobile, if she should be captured by an armed force, without any fault or neglect of the officers and crew, in such case neither the boat nor owners are liable for such loss."

On the trial, as the bill of exceptions states, Boon & Co. read in evidence the libels in the other two cases; and the respondents read in evidence their answers in the other cases, and admitted the due execution of the several bills of lading, and the receipt of the cotton as therein specified. "It was then agreed that the three cases should be tried upon the same issue ; and the case of Boon & Co. was selected as the case. The libellants, by their counsel, excepted to so much of the answer to the libel as is in the following words"—viz., the seventh paragraph above set out—"as being insufficient in law to bar a recovery, because a capture above tide-water, within the body of a State, was no bar to the action. The court sustained this exception, and the respondents, by their counsel, excepted.

"Respondents, by leave of the court, filed an amendment to their answer ; in which they alleged, that said boat was regularly licensed and enrolled at the custom-house in the city of Mobile, Alabama, under and in pursuance of the laws of the United States, on the 11th day of October, 1865;

that said boat procured a clearance from the custom-house, to-wit, in the city of Mobile, Alabama, for the city of Columbus in the State of Mississippi; that she was regularly engaged in navigation and commerce between said cities of Mobile and Columbus; that on her downward trip from Columbus, to-wit, on or about the 25th January, 1866, the cotton which is the subject-matter of this suit was lost, while said boat was engaged in navigation and commerce between said cities of Columbus and Mobile; that said boat returned to Mobile, and again, to-wit, on the 3d day of February, 1866, procured a clearance at the custom-house in Mobile, for the city of Columbus, Mississippi, but was libelled in this case and others before she left; and they insisted, that the city court of Mobile had no jurisdiction in said cause. The libellants, by their counsel, excepted to the foregoing allegation, upon the ground that it was not sufficient to bar the action. The court sustained the exception, and the respondents excepted.

"The respondents then amended their said answer, by leave of the court. The libellants excepted to each allegation, and their exceptions were sustained by the court; to which the respondents excepted." The amended answer, which was made an exhibit to the bill of exceptions, was in the following words:

"1. Respondents say, they are informed and believe that it was agreed and understood, by and between the captain of said boat and the libellants, at the time the said bills of lading were made and said cotton was shipped on said boat, that if said boat was captured and robbed, on her downward trip to Mobile, by an armed body of men, without any fault or neglect on the part of the officers and crew of said boat, and said cotton should be thereby lost, that such loss was to be borne by the owner of said cotton, and neither the said boat nor owners were to be liable for said loss; that said agreement would have been reduced to writing, and incorporated in said bills of lading given for said cotton, but for the reason that said captain was led to believe, and did believe, from the representations of libellants, that a custom prevailed on said river, which made it unnecessary to incorporate said agreement in said bills of

lading: that is to say, that libellant represented to said captain, that, in point of fact, such a custom did exist on said river; and said captain believed said representations to be true, and received said cotton, and caused said bills of lading to be given for it, as aforesaid, without incorporating in the said bills of lading as aforesaid said agreement; that this would not have been done, but for said representation as aforesaid by said libellant; that the supreme court of Alabama have since, as respondents are informed, decided, in effect, that in point of fact no such custom existed, or could exist, because to establish it by proof would be to contradict the written contract. Respondents therefore insist, that said contract was entered into by mistake of fact, to-wit, as to the existence of such custom as aforesaid, at the time said cotton was shipped and said contract was made as aforesaid, and at the time said bills of lading were given as aforesaid.

"2. Respondents, further answering, insist that said bills of lading were obtained by fraud and misrepresentation, in this, that they are informed that said libellants, before said bills of lading were signed and delivered, informed the captain of said boat that a custom existed on the Tombigbee river, that when cotton was shipped on board of a steamboat, to be transported to Mobile, that if the boat should be captured by an armed body of men, and robbed, while descending said river, and said cotton thereby lost to the owner, that neither the boat nor owners were to be liable for said cotton, when in truth, as they are informed, no such custom existed; that said libellants, as respondents are informed, represented to said captain, before said cotton was shipped as aforesaid, and before said bills of lading for said cotton were signed, that such a custom as aforesaid did exist on said river, and that it was not necessary to incorporate it in said bills of lading, because, if said boat was thus robbed, and the cotton lost to the said owners, without any fault or neglect of the officers or crew of said boat, that the said boat and the owners thereof were in no way liable for the loss; and that said captain, believing said statement of facts to be true, received said cotton

without inserting in said bills of lading the exception of being robbed as aforesaid by armed robbers, without any fault or neglect of the officers or crew of said boat, while said boat was descending said river as aforesaid. Respondents therefore insist, that said false representation was a fraud upon said captain and owners of said boat, and that said bills of lading were obtained by the fraud and false representations of the said libellants, which, if they had not been made, as respondents are informed, said captain would not have received said cotton on said boat, and would not have allowed said bills of lading to have been signed, or delivered to said libellants for said cotton as aforesaid."

"The libellants introduced evidence tending to show, that all the cotton received was not delivered, and that the value of that not delivered was four thousand dollars; also, tending to show that said sum of four thousand dollars covered the loss of all three of the libellants. The respondents now claim an appeal, in open court; and it is granted, upon the respondents giving sufficient bond for costs. And it is admitted, by the libellants, that said boat was robbed upon tide-waters in the State of Alabama, about one hundred miles above the city of Mobile, without any fault or neglect of the officers or crew of said boat."

The decree of the court, after ordering that the three cases be consolidated, proceeds thus—"And now on this day came the several libellants and respondents, by their counsel, and this cause, having been regularly continued until this day, is submitted to the court for a final decree. And the respective libels, answers, and evidence, being duly considered by the court, it is adjudged, that the allegations contained in the said libels are true; that the several claims therein propounded are valid liens on said steamboat, her tackle, apparel, and furniture; that the claim of Boon & Co., as set forth in their libel, has been sustained by proof, to the amount of one thousand dollars, for which they are allowed a decree, with their costs; that the claim of J. H. & S. B. Steers, as set forth in their libel, has been sustained by proof, to the amount of fourteen hundred dollars, for which they are allowed a decree, with their costs; that the claim of John Watson & Co., as set forth in their

libel, has been sustained by proof, to the amount of sixteen hundred dollars, for which they are allowed a decree, with their costs. And it is further ordered, that the said steamboat *Belfast* with her tackle, apparel, and furniture, be exposed at public sale, in front of the courthouse-door, by the sheriff of Mobile county; that he give ten days' previous notice of the time and place of making such sale; and that out of the proceeds of the sale of said steamboat, he satisfy the several decrees in this case, and the costs, and, if there be any residue left in his hands, that he pay the same to the parties entitled by law to receive it."

The appeal is sued out by said Nelson and Hurtel, who here assign as error all the rulings of the city court, to which, as above stated, they reserved exceptions, and also the final decree.

W. Boyles, for the appellants.—1. By section 2692 of the Code, a lien is given for work done, and materials furnished, within the State. The act of 1864, entitled "An act to amend the admiralty laws of this State," gives a lien for freight not delivered, to be enforced in the same manner, and governed by the same rules, &c., as prescribed by the Code. This act was simply intended to give the same lien for freight not delivered, as was given by section 2692 for materials furnished. These statutes must be construed in *pari materia*. They are *strictissimi juris*, and must be strictly construed : they can not be extended by construction, analogy, or inference.—19 Howard, 89 ; 2 Curtis, 404, and cases there cited. As to the general rules of construction applicable to such statutes, see 1 Brock. 23–4 ; 4 Gilm. 207 ; 10 Pick. 506 ; 7 Blackf. 556. The act of 1864 does not specify where the freight is to be received, nor where it is to be delivered ; but it must be construed to apply only to boats navigating the wholly interior rivers of the State. To construe it as applicable to vessels engaged in navigation and commerce between two or more States, would make it, to that extent, unconstitutional and void. The failure to deliver freight by a vessel licensed and enrolled under the laws of the United States, and engaged in commerce between the States, creates a maritime lien, which

can only be enforced in the Federal courts. The jurisdiction of the United States courts, in admiralty and maritime cases, is given in general terms by the constitution, and is exclusive of all jurisdiction in the State courts. Where a boat is engaged in navigating waters altogether within the limits of the State, the State courts have jurisdiction; but, where she is engaged in navigation and commerce between two or more States, the jurisdiction of the Federal courts is exclusive. These principles are sustained, and enforced by conclusive reasoning, in the following cases : 5 Wheaton, 1, 21; 9 Wheaton, 196–222; 14 Peters, 540, 569, 579; *Jackson v. Steamboat Magnolia,* 20 Howard, 304; *Sinnot v. Davenport,* 22 Howard, 227; 19 Howard, 89; 19 Missouri, 518; 9 Indiana, 525; 17 Iowa, 349; 2 Story's C. C. R. 464; 1 Black's U. S. R. 522, 579. In the cases of *McGuire v. Card,* (21 Howard, 248,) and *Chopper v. Boston Belting Co.,* (22 Howard, 217,) Federal jurisdiction was denied, because the boat was, in each case, engaged in the purely internal navigation of the State. The case of *Newberry v. Allen,* (21 Howard, 244,) turned upon the construction of the act of 1845; and it does not overrule or militate against the decision in the case of *Jackson v. Steamboat Magnolia, supra.*

2. The boat was captured upon tide-waters, and robbed, without any fault or neglect on the part of the officers or crew. Robbery on tide-waters is declared piracy by the act of congress of 1820.—1 Brightly's Digest, 208, § 35; 5 Wheaton, app. 148, note 4. This act of congress is founded on the constitutional grant of power "to define and punish piracy," committed on the high seas. Waters within the ebb and flow of the tide are arms of the sea. Gilpin's R. 526; Baldwin's C. C. 15. Piracy being one of the exceptions to the liability of a common carrier, robbery on tide-waters comes within the exception in this country.—Abbott on Shipping, 476–7; Story on Bailments, § 512; 4 McLean, 259; 3 Kent's Com. 278; 3 Stew. & P. 176, and cases cited; 2 Conkling's Admiralty, (2d ed.) 160; 1 Parsons on Contracts, 638; 1 Black's U. S. R. 487.

3. The court erred in sustaining the exception to the allegations of fraud and mistake in procuring the bills of lading. That parol evidence is admissible to show a mis-

take in a bill of lading, see 3 Iowa, 268; 13 Metcalf, 517; 20 Ohio, 147; 6 McLean, 487; 3 Wash. C. C. 5; 6 Cranch, 338; 1 Sumner, 218; 2 Sumner, 387. The existence or non-existence of a local custom is a question of fact.— 29 Ala. 200; 25 Ala. 498. As between the shipper and the common carrier, the bill of lading is not conclusive, but may be rebutted by proof of mistake or fraud.—1 Parsons on Maritime Law, 143; 13 La. Ann. R. 452. Parol evidence of fraud is admissible, although the contract has been reduced to writing.—*Blackman v. Johnson*, 35 Ala. 252; *Dixon v. Barclay*, 22 Ala. 370. The allegations of the answer make out a case of fraud, although it is not averred that the libellants knew the falsity of the representations at the time.—16 Ala. 785; 34 Ala. 663; 29 Ala. 668; 27 Ala. 203; 35 Ala. 253; 21 Ala. 714; 11 Ala. 345; 9 Ala. 662; 4 Scam. 596; 4 How. (Miss.) 435; 4 N. H. 348; 7 E. D. Smith, N. Y. 238; 2 Barr, 240; 6 Missouri, 59; 26 Geo. 74; 35 Penn. 23; 46 Maine, 303; 22 Pick. 546; 6 McLean, 95. In cases of fraud, a court of law has concurrent jurisdiction with a court of chancery.—8 Peters, 244; 12 Peters, 11. Courts of admiralty, moreover, " act upon the enlarged and liberal jurisprudence of courts of equity." 2 Parsons on Maritime Law, 649; 2 Sumner, 243; 2 Greenl. Ev. §§ 388–89.

4. The record does not set out sufficient evidence to sustain the decree, as required by the rules of practice in admiralty cases.—1 Sumner, 328; 7 Cranch, 789; Gilpin's R. 37; 10 Wheaton, 431; Dunlap's Admiralty, 79.

E. S. DARGAN, *contra.*—1. At common law, an action could have been maintained on the bill of lading, for a non-delivery of the cotton. The State certainly has the constitutional authority to prescribe the manner in which that liability may be enforced; whether by action at law, by bill in equity, or by a proceeding in the nature of a libel in admiralty. The grant of admiralty jurisdiction to the courts of the United States gives them exclusive jurisdiction of all matters which can only be adjudicated in admiralty, but not of all matters which by statute may be made cognizable in courts of admiralty, nor of all suits which may be

conducted according to the rules of admiralty practice. Where the matter is cognizable at common law as well as in admiralty, the jurisdiction of the Federal and State courts is concurrent.—*Taylor v. Carryl*, 20 Howard, 598; 7 Ala. 59. The act of 1864 was a legitimate exercise of the constitutional power of the State, and was intended to give a lien on all steamboats navigating the interior waters of the State, for a failure to deliver freight at the place within its limits designated in the bill of lading. The failure to deliver the freight, at the place stipulated, creates the lien, and gives the cause of action; and the place of shipment is immaterial.—6 Ala. 50.

2. Robbery does not excuse the liability of a common carrier. The act of congress of 1820, declaring robbery on tide-waters to be piracy, can not change the civil rights or liabilities of third persons, growing out of the unlawful act.

3. The plea of fraud, as set up in the amended answer, is negatived by the allegations of the original answer; and, therefore, the exception to it was properly sustained. If the matter of the plea had been properly presented, it would have constituted no defense.

BYRD, J.—1. It seems to be the settled law of England, that the maritime lien which a shipper has upon a vessel, for an injury to his goods, can not be enforced in a court of admiralty.—Abbott on Shipping, 127; *Birley v. Gladstone*, 3 M. & S. 205; *Gladstone v. Birley*, 2 Mer. 401; *Pierson v. Robinson*, 3 Swanst. 139, n. But in this country the rule is otherwise.—*Clark v. Barnwell*, 12 Howard, 272; *Rich v. Lambert*, ib. 347; *Schooner Volunteer*, 1 Sumner, 551; *The Gold Hunter*, 1 Bl. & Howl. Adm. 300; *The Boston*, ib. 309.

Whether this lien attaches in fresh-water navigation, or where the water is partly fresh and partly tidal; whether on vessels employed exclusively in State or inter-State trade; whether, where it does attach, the admiralty courts of the United States have exclusive jurisdiction or not; and if not, in what cases it is exclusive, and in what the States have concurrent and independent jurisdiction; these, and cognate questions, have been subjects of discussion in this

Steamboat Belfast v. Boon & Co.

country, and upon some of them the adjudications have been variant and conflictive. Without attempting a review of the cases, we will cite the leading ones : *DeLovio v. Boit*, 2 Gallis. 398 ; *Ramsay v. Allegre*, 12 Wheat. 614 ; *The Gen. Smith*, 4 *ib.* 438 ; *Hallett v. Novion*, 14 John. 273 ; 16 *ib.* 327 ; *The Thomas Jefferson*, 10 Wheat. 428 ; *Waring v. Clarke*, 5 How. 441 ; 6 *ib.* 344 ; *Paroux v. Howard*, 7 Pet. 524 ; *Orleans v. Plabus*, 11 Pet. 175 ; *The Commerce*, 1 Black, 574 ; *The Genesee Chief*, 12 How. 443 ; *Fretz v. Bull*, *ib.* 466 ; *The Magnolia*, 20 *ib.* 296 ; *Pierce v. Page*, 24 *ib.* 228 ; *Stokes' Case*, 22 *ib.* 48 ; *Allen v. Newberry*, 21 *ib.* 244 ; *The Niagara*, *ib.* 7 ; *Sturges v. Clough*, *ib.* 451 ; *Taylor v. Carryl*, 20 *ib.* 583 ; *Gilman v. Philadelphia*, 3 Wallace, 713 ; and cases cited in the foregoing, and on brief of counsel in this cause.

In the case cited from 3d Wallace, Justice Swayne, delivering the opinion of the court, says : "The States may exercise concurrent or independent power, in all cases but three : 1st, where the power is lodged exclusively in the Federal constitution ; 2d, where it is given to the United States, and prohibited to the States ; and, 3d, where from the nature and subjects of the power it must necessarily be exercised by the national government." In that case he further says : "The power here in question does not, in our judgment, fall within either of these exceptions." That case, in its facts, was not like this, but in principle we can see no substantial difference.

In the case of *Taylor v. Carryl, (supra,)* Justice Campbell, delivering the opinion of the court, quotes approvingly from Judge Story, as follows : "Mr. Chancellor Kent and Mr. Rawle seem to think, that the admiralty jurisdiction given by the constitution is in all cases necessarily exclusive. But it is believed that this opinion is founded in mistake. It is exclusive in all matters of prize, for the reason that, at common law, this jurisdiction is vested in the courts of admiralty, to the exclusion of the courts of common law. But, in cases where the jurisdiction of the common law and admiralty are concurrent, (as in cases of possessory suits, mariners' wages, and marine torts,) there is nothing in the constitution necessarily leading to the conclusion, that the jurisdiction was intended to be exclusive. * * * * But

the States might well retain and exercise the jurisdiction, in cases of which the cognizance was previously concurrent in the courts of common law."

From these principles we conclude, that the States have the power to confer on their courts the jurisdiction to enforce a maritime lien, arising within their respective limits, where, by the common law, such courts had jurisdiction of the subject-matter. At common law, a shipper, on a vessel engaged in either foreign or internal navigation, could bring a suit in the common-law courts, to recover damages for any injury to the goods shipped by him, for which the owner of the vessel was liable. Seamen have a lien on the vessel, for their wages earned in her service, which they could enforce in a court of admiralty; and they also had a remedy by an action in a court of common law, for services rendered, against the owner of the vessel, or the person on whose account the vessel was running; and we see no reason why the State legislature is not competent to authorize its courts to enforce that lien, *even* in a suit in the nature of an admiralty proceeding, without in the least interfering with the admiralty jurisdiction of the courts of the United States.

We see nothing in the case of *Jackson et al. v. Steamer Magnolia, (supra,)* in conflict with these views. That case only decides, that the Federal courts have jurisdiction of a *marine tort*, committed within a county of a State, and above tide-water. It does not hold that the jurisdiction is exclusive in those courts over such torts. The supreme court of the United States have not been harmonious in their decisions upon this and kindred questions, and the members of the court have, on several occasions, been nearly equally divided; as, in the cases of the *Steamer Magnolia, Taylor v. Carryl,* and *Gilman v. Philadelphia, supra.* This court has heretofore passed upon the jurisdictional question involved in the decision of this cause.—*Richardson v. Cleavland,* 5 Porter, 251; *Steamer Morris v. Williamson,* 6 Ala. 50; *Steamer Farmer v. McCraw,* 31 Ala. 659.

From these decisions, and those above cited, we deduce the following propositions: That, by the maritime law, a shipper has a lien on the vessel, for any damages to his

goods, for which, by the common law, he could maintain an action ; that this lien was not enforcible in a court of admiralty in England ; that such a lien may be enforced in the courts of the United States having admiralty jurisdiction ; that their jurisdiction is not exclusive in all cases, but the State legislatures may confer on their courts the authority to enforce such lien by a suit in the nature of an admiralty proceeding, in all cases, *where*, by the common law, the State courts would have jurisdiction of the subject-matter of the suit, *and* the contract of shipment was made, the damage done, and the place of delivery under the contract was to be, within the jurisdictional limits of the State. We thus limit the proposition, for the reason that the facts of this case are within the limitations laid down.

Whether by the maritime law any lien exists in favor of a shipper for an injury to his goods, against the vessel upon which they are laden, navigating exclusively the rivers of a State or country above tide-waters, although the tides flow from the ocean or bays up such river a considerable portion of their navigable course, is a question not necessary for us to decide in this case. If that law did not give such a lien in such a case, then it seems clear to us, that the State legislature *could* declare such a lien, and *authorize* its enforcement in its courts.

We have discussed the question as though such a lien, in such a case, was given by the maritime law ; and in that view we hold, that the weight of authority sustains the constitutionality of the act of the 7th October, 1864, under which this proceeding was commenced, *at least* to the extent contended for by the counsel for *Boon & Co.* As to the other libellants, the bill of exceptions shows, that " it was agreed that all three cases should be tried upon the same issue, and the case of *Boon & Co.* was selected as the case." If Boon & Co. are entitled to recover, then the effect of the agreement is to authorize a recovery in favor of the other appellees.

2. At common law, a common carrier, who was deprived of goods by pirates, was excused from liability, if without fault himself, to the owner or consignee. Robbery was no defense. Congress has declared, by an act approved in

1820, that any person, who shall, upon the high seas, or in any river where the tide ebbs and flows, &c., commit robbery, and be convicted thereof, shall be adjudged to be a pirate, and punished with death.—1 Brightly's Digest, p. 208, § 35. This act seeks to protect the carrier, by punishing the offender as a pirate, and not as he would be, if left to the State courts, as a robber, and by a heavier penalty than robbery is generally punished by the State laws. It appears to us to be a violation of the received rules of interpretation, or acceptation of legal terms and definition of crimes, to hold that the persons who robbed *The Belfast* are pirates within the meaning attached to that term by the common or maritime law; and it would be equally violative of legal principles and justice to hold, that a law which adjudged and punished them as pirates, would therefore relieve the carrier who had been so robbed from a common-law liability arising from the contract of shipment.

In the case of *The United States v. Jackalow,* (1 Black, 487,) the supreme court say, that it is competent for congress to prescribe the punishment of offenses committed on the high seas, in any haven or bay, or in any river where the sea ebbs and flows, although within the limits of a State. Without questioning, *at this time,* the doctrine thus *broadly* laid down, still we do not see how congress can, by a criminal law, change or modify the civil liabilities of persons contracting within a State. If so, it would seem that congress might, by declaring that larceny, or embezzlement, on any vessel by any officer thereof, or other person, upon the high seas, or any river where the tide ebbs and flows, within the limits of a State, was piracy, *relieve* the carrier from liability for goods or money thus stolen or embezzled. A criminal law should not be construed in derogation of civil liabilities imposed by the common law and by contract, nor should it be given an effect beyond the legitimate objects of the law—the prevention of crime, and the punishment of the offender.

3. The counsel of the appellant contends, that the court should not have sustained the exceptions to the amended answer, set out in the record as "Exhibit W" to the bill of

exceptions. Neither the exhibit, nor the bill, shows what the exceptions were. If, therefore, any valid exception could have been taken, we must presume, in support of the ruling of the court, that it was taken. The counsel for appellees insist, that this amendment is repugnant to the original answer, and that therefore the court properly sustained the exception to it. Such an objection to the filing of the amended answer *might* have been well made ; but, after the court had allowed the party to file it, such an exception, under the liberal system of pleading tolerated in modern times, and by our Code, would come too late, and ought not to prevail.

4. The first plea, in the amended answer, is founded upon an alleged mistake in the contents and execution of the bill of lading. Such a mistake, if available in any court, can not be invoked by the appellant as a defense to the libel, in the form here pleaded. It is averred, that the "contract of shipment was entered into by mistake of fact, to-wit, as to the existence of such custom," &c. A mistake made in the contents of a written contract can not be taken advantage of by way of defense, in a court of law or equity, but, to avail himself of it, the party must become the actor in a court of equity for the reformation of the contract.— *Hogan v. Smith,* 16 Ala. 622 ; 1 Story's Eq. Ju. §§ 111, 116, 120–6–8, 137, 146–9, 150–3–8.

5. The second plea sets up fraud and misrepresentation of the several libellants in procuring the execution of the bills of lading ; and it is, therefore, contended by the counsel for appellant, that no recovery can be had on the bill of lading, or in this proceeding. A question of some intricacy is presented by the contents of this plea. The law, as to the effect of fraud upon all contracts, is clear and well defined ; and we shall, in the course of this opinion, refer only to so much of that law as is applicable to the contents of this plea. In passing upon the matters set out in the plea, we will refer to two reflections which claim some notice. One is, that the captain of a steamboat, engaged in navigating a river, should be deceived by the representations of others as to the existence of a custom, which vitally affected the liabilities of the vessel or its owners, in whose service

he was employed. The other is, that he should have so readily declined from putting a clause in the bill of lading, upon a representation that the custom of the river rendered it unnecessary; if such was the fact, why should the shippers have objected to its insertion? The very objection by them was sufficient to have put the captain on his guard, and made him insist on putting in the bill of lading the exception of loss by robbery; for, if such exception had been established by custom, the shippers could not have been injured by its insertion, *if* such a custom could be set up against the common law,—which this court has held could not be done.

And here lies the difficulty of the case. Taking the averments of the plea to be true, it seems to us that the representations made, related to both matters of fact and law. As to the latter, the captain, in contemplation of law, was not ignorant; and as to matters of fact, whether he knew them to be true or not, he seems to have been negligent in acquiring a knowledge of a custom affecting the business in which he was engaged, and as to the existence of such a custom, if it existed, as to which he ought to have been as well acquainted as the libellants, if not better; and there was no relation existing between the parties, which authorized the captain to rely upon the representations alleged to have been made, without inquiry. Ordinarily, a fraudulent misrepresentation of a matter of law is no ground for an action or relief.—*Martin v. Wharton,* 38 Ala. 637. A misrepresentation of a matter of fact may be. A custom, to have the force and effect of law, must conform to all the rules laid down in the books; and though its existence may be a question of fact in one sense, yet its effect is matter of law; and as to the latter, it is a trite maxim, *ignorantia legis neminem excusat;* nor can a fraudulent misrepresentation of the *effect* of law upon a given state of facts, *ordinarily* afford any right to relief, or any defense to an action.—*Juzan v. Toulmin,* 9 Ala. 684; *Cowles v. Townsend,* 37 Ala. 77; *Hogan v. Smith, supra;* 1 Story's Eq. Ju. §§ 191-7-9, 200 *a*; 2 Kent, 484-86, 4th ed.

A party who sets up a fraudulent misrepresentation of facts, as a ground of relief or defense, must not be guilty

Steamboat Belfast v. Boon & Co.

of laches; and if it appears that he did not not use ordinary diligence, in acquiring a knowledge of the facts, and that he did not stand in a relation to the party making the representations, which authorized him to rely upon them without inquiry, he can not avail himself of such representations as a ground of relief or defense.  No such relation is set up or insisted on in this case, and the captain acted on the representations, alleged to have been made, improvidently, if not recklessly, in a matter as to which he ought to have been as well informed as the libellants; and the very assertion which they made as to the custom, and objection to its insertion in the bill of lading, should have put the captain on the inquiry.  Taking all these views together, we are of opinion, that the plea under consideration is insufficient and, defective, and the court therefore properly sustained the exceptions thereto.—See authorities last cited.

The record does not purport to set out all the evidence, and if the evidence set out was not sufficient, we would presume that there was sufficient introduced to authorize the decree of the court below.

The foregoing disposes of all the questions raised, and so thoroughly argued by the learned counsel for both parties, at the bar and in writing; and, as we are not able to detect any error assigned upon the record, the decree of the court below must be affirmed, with costs.

BYRD, J.—Since writing the foregoing opinion, the case of the steamboat *Ad. Hine v. Trevor*, decided at the December term, 1866, of the supreme court of the United States, and in manuscript, has been brought to our notice by appellant's counsel; and he earnestly insists that it is decisive of this case.  We were not aware that such a decision had been made, and we consider it as settling clearly some of the questions to which we refer in our opinion as being unsettled; and upon the facts of that case, there can be no doubt of the correctness of the result attained by the court.  The main fact in that case, which was decisive of the question of the jurisdiction of the courts of Iowa, is, that a State can neither confer a lien, nor enforce a right,

arising under the maritime law of the United States, or by statute of a State, where a marine tort takes place out of the limits of the State, and in another State. That was a question involved in the decision of that cause, and that decision must be the law of this court.

Mr. Parsons, in his work on Maritime Law, says: "In fourteen of our western and southern States, actions may be brought against vessels by name. * * * * But in these States, it seems, that actions of this sort will not be sustained under their statutes, if the cause of action arose out of the State." This view would have been decisive of the case of the *Ad. Hine, supra.* Mr. Parsons further says (vol. 2, p. 510): "The act of 1845, relating to the lakes and navigable waters connecting the same, gives no jurisdiction over the domestic commerce of a State—that is, over contracts for carrying goods between ports and places in the same State;" and he cites the case of *Allen v. Newberry,* 21 How. 244.

Mr. Parsons is speaking of the jurisdiction of the United States courts as courts of admiralty, in the above extract. In the case of *Allen v. Newberry,* it is decided, that the jurisdiction of those courts does not extend "to a case where there was a shipment of goods from a port in a State, to another port in the same State, both being in Wisconsin." Nelson, J., delivering the opinion of the court, says: "In the case of *Gibbon v. Ogden,* (9 Wheat. 194,) it was held, that this power did not extend to the purely internal commerce of a State;" and he quotes the following extract from the opinion of Chief-Justice Marshall in that case: "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, when they do not affect other States, and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then," he observes, "may be considered as reserved for the State itself." Justice Nelson, in the same case, quotes from the case of *The New Jersey Steam Navi-*

*gation Company v. Merchants' Bank,* (6 How. 392,) as follows : "Contracts growing out of the purely internal commerce of the State, &c., are generally domestic in their origin and operation, and could scarcely have been intended to be drawn within the cognizance of the Federal courts."

The case of *Allen v. Newberry* is "on all fours" with the case under consideration. In that case, the boat was running between a port in Wisconsin and one in Illinois ; and in the case before us, the boat was running between a port in Mississippi and one in Alabama ; and in both cases, the goods were shipped at a port in one State, to be delivered in another port in the same State.

In the case of the *Ad. Hine,* the court has not considered the case of *Allen v. Newberry ;* and it was not necessary to do so, for it does not lie within the same field of maritime jurisdiction—*marine torts* and *contracts of affreightment.* To reverse this case, we would have to disregard the case of *Allen v. Newberry ;* which we are not disposed to do, but will leave it for the consideration of the supreme court of the United States, whether the case of the *Ad. Hine* is in conflict with that case. We do not think that there is any conflict. If in this case we are mistaken, it will give that court an opportunity to settle another question as to the admiralty jurisdiction of the Federal courts.

The distinction we make may be thus stated : Neither by the common law, nor by the maritime law, had the shipper any lien on a vessel for goods laden on and lost by it, where the vessel was navigating rivers or waters within the body of a county ; and we can not see how the grant by the Federal constitution, of all admiralty and maritime jurisdiction, to the circuit courts of the United States, can create a maritime lien in favor of a shipper, where the contract of affreightment is made, and the goods are shipped, and are to be transported to a place within the body of a State. We can find no authority whatever for such a doctrine. It is unnecessary to consider whether, by the maritime law of Europe, a shipper has such lien against vessels navigating the Seine, the Danube, the Rhine, or Vistula, without going out to sea, or beyond the limits of the kingdoms within which they respectively have their course. For those king-

doms, or most of them, are governed by the civil, and not by the common law; and it is well settled, that the common law of England is the common law of this country, so far as it is accommodated to, or modified by our institutions; and to hold that a shipper's lien exists by the maritime law, on a vessel running exclusively the rivers of a State, would be a confusion of terms and ideas wholly unknown to, and unrecognized by, the common law or the maritime law of England or this country. We admit, that it may be competent for congress to declare such a lien, under the grant of power to regulate commerce between the States. But we are not aware that congress has ever done so; and in the absence of congressional legislation, it is competent for the States to declare such a lien to exist upon the vessels running within their limits, upon contracts of affreightment made within their jurisdiction, and to be executed within the same.

By way of illustration, take the case of a steamboat running between Rome, in Georgia, and the Ten Islands in the Coosa river, in Alabama, on a portion of that stream which has no navigable connection with tide-water. Can a maritime lien, in favor of a shipper on such a boat, be said to exist by the maritime law, or by any act of congress? If so, we are not aware of it. If, as in the case of *Allen v. Newberry*, no such lien is declared in such a case by the act of congress of 1845, on the north-western lakes and rivers, we can not see how such a lien exists under the act of 1789, or by the maritime law. Besides, if the act of 1845 did not declare such a lien to exist on those lakes and rivers, still the act of 1789, and the maritime law, were then in force throughout the whole extent of our country; and if such a lien did exist under the latter act, or by the maritime law, of which the admiralty courts of the United States had exclusive jurisdiction, the court would have so declared in the case of *Allen v. Newberry*. All the decisions—from the existence of the government—of the United States courts, have uniformly held that such a contract of affreightment as was made in this case, was not within the jurisdiction of the United States courts; and all the State courts and legislatures have so held; and under the adjudication

Steamboat Belfast v. Boon & Co.

of the *Moses Taylor* and *Ad. Hine,* we do not feel that we are authorized to depart from them.   We do not consider those cases as touching the point of this, or as overruling *Allen v. Newberry.*   We concede, that the question has, perhaps, become somewhat involved in difficulty by those cases; and even if we thought they had rendered the question doubtful, it might be our duty, if such a practice prevailed, to certify it to the supreme court of the United States, as novel and difficult; and not being able to do so, to decide the case as we have done, so as to permit the only party who can, to appeal to that final tribunal.

This case raises points, which, perhaps, will enable that court to lay down a rule which will finally settle the questions left open by the case of the *Ad. Hine.*   If the State had the power to give a lien by law, to a shipper on a vessel in such a case of affreightment as this, then we hold, that the State could also confer the jurisdiction upon their courts to enforce such a lien, and that they could do so by a process of foreign attachment, or by a proceeding in a common-law court in the nature of an admiralty proceeding.   We can see no substantial reason why one form is more objectionable than the other; for, whilst we concede that the States have no authority to establish courts of admiralty, we can not see why the States could not adopt admiralty forms and proceedings, where applicable, to try civil causes, preserving, as the statute does in this case, the right of trial by jury.   We therefore adhere to the conclusion attained in the former opinion, and modify the reasoning thereof, to the extent it has been overturned by the cases of the *Moses Taylor* and the *Ad. Hine,* and no further.

A. J. WALKER, C. J.—By the second section of the third article of the constitution, the judicial power of the United States extends to all cases of admiralty and maritime jurisdiction.   The ninth section of the act of congress of 1789 declares, that the district courts of the United States shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction.—1 Brightly's Digest, 24.   Whatever may have been the earlier ad-

6

judications of the Federal and State courts, and the deliverances of the American law-writers, the late decisions of the supreme court of the United States establish, in my judgment, the following propositions: 1st, that the admiralty jurisdiction bestowed by the 9th section of the act of congress of 1789, on the district courts of the United States, excludes all admiralty jurisdiction by the State courts, and that that act is constitutional; 2d, that a contract of affreightment has an admiralty lien on the vessel, which may be enforced by libel, and that jurisdiction over such contracts and liens appertains to the district courts of the United States, under the provisions of the constitution and the act of 1789; 3d, that this jurisdiction extends to contracts of affreightment made and to be executed upon an interior river, above tide-water, and within the territorial limits of a single State; and, 4th, that the proceeding under the Alabama statute in this case is an admiralty proceeding, and involves the exercise of admiralty jurisdiction.

From these propositions it results, that the act under which this proceeding was had is in contravention of an act of congress, passed in pursuance of the constitution of the United States, and is void; and the court below had no constitutional jurisdiction of the case. I cite the decisions which, in my judgment, establish the foregoing propositions, with the single remark, made with the utmost respect for my brothers, that they seem to me to be conclusive, and that I yield to them because they are, upon correct judicial principles, binding upon us.—*The Genessee Chief*, 12 How. 443; *The Magnolia*, 20 *ib.* 296; *The Moses Taylor*, in MSS.; *The Ad. Hine*, in MSS.

I think there is no distinction, so far as the question of jurisdiction is concerned, between those cases in which the admiralty jurisdiction is based upon a marine tort, and those in which it is based upon a contract of affreightment; and that, consequently, the decisions in the former class of cases are applicable to the latter, to which this belongs. The supreme court of the United States has changed its position upon the subject of restriction of its admiralty jurisdiction, so as not to apply to commerce upon navigable interior rivers; and as an appeal lies to the supreme court

of the United States, I think it is our duty to make a corresponding change.

I concur with my brothers in their opinion upon the other points decided.